Filed 5/19/15  In re Noah T. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| In re NOAH T. et al., | B257894 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. DK00540) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.T., Defendant and Appellant. |  |

APPEAL from an order of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

E.T. (Mother) appeals from the juvenile court's disposition order removing her son, Noah T., and her daughter, I.T., from her custody, requiring her to undergo a psychological evaluation pursuant to Evidence Code section 730, and requiring her visits with her children to be supervised. Mother does not challenge the juvenile court's jurisdictional findings that her children are persons described by Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (j). We conclude that there is no merit to Mother's challenges and affirm the disposition order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Family*

Mother and Wade N. (Father)[2] are the parents of Noah T. (born in 2005) and I.T. (born in 2010). The family is originally from Michigan.

During Father and Mother's marriage, there were ongoing incidents of domestic violence. According to Mother, Father would hit, punch, drag and threaten to harm her with knives.

In 2009, while Mother was pregnant with I.T., Father beat Mother in the presence of Noah after Mother said she wanted to end her relationship with Father. Father was arrested and convicted. Mother has had no further contact with Father since his incarceration. She is fearful that Father will find her and harm or kill her. While Father was incarcerated, Mother left Michigan, along with Noah and I.T., and eventually made her way to California. Father has never met I.T.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]    Father is not a party to this appeal.

**B.** *Mother Voluntarily Relinquishes Custody of the Children*

On Friday, August 16, 2013, Mother called the Los Angeles County Department of Children and Family Services' hotline and said she wanted to give up her children. At the time Noah was seven and I.T. was three. Mother told the intake evaluator to whom she spoke that she and her two children had been homeless for two years and had been moving from shelter to shelter. Mother said she wanted DCFS to take her children so she could have some time to get herself together. Mother stated, "I feel like I can't do it anymore" and "I haven't been able to do it." The intake evaluator advised Mother that she could go to a Regional DCFS Office and talk to a children's social worker (CSW) or supervisor about getting voluntary services but the offices would not be open until Monday.

Upon further inquiry the intake evaluator learned that Father had gone to prison in 2009 for domestic violence against Mother, who was fearful that Father would find them. Mother explained that she had no family or friends with whom she could leave her children. Mother said she was "depressed" and had been depressed "'on and off' her whole life." Mother started crying and said her depression had been getting worse since being homeless. Mother claimed she was "'hopeless'" and asked for a CSW to come talk to her.

Later that evening, a CSW from DCFS's Emergency Response Command Post met with Mother at her shelter. Mother explained that she could not care for her children because she lacked income and she had run out of options. Mother said that she was a victim of domestic violence and that she left Michigan because Father beat her while she was pregnant with I.T. Mother also expressed her belief that Father had abused Noah sexually. She reported the sexual abuse to the authorities in Michigan, but they did not do anything since Father was already incarcerated for domestic violence.

Mother further explained that she and the children left Michigan and went to Georgia where they stayed for a few weeks in a domestic violence shelter. The shelter claimed they were not safe in Georgia and gave them bus tickets to California. For the two years they have been in California, she and her children have been moving from

3

place to place.  During this time she had a boyfriend with whom she was involved in an incident of domestic violence.  She has a restraining order again him.

Although Mother stated she has never been diagnosed, she feels depressed and hopeless.  She also noted that Noah "has a host of behavioral problems."  He cannot sit still, does not listen, fights, argues, lies and makes up stories.  He also started wetting the bed when they arrived in Los Angeles and consequently wears a diaper at night.  Mother told the CSW that she needs help and wants DCFS "to take temporary custody of her children until she can get on her feet."

Mother executed an affidavit in which she stated:  "I would like to give my 2 children over to DCFS custody until I am able to get up on my feet.  I do not feel I am able to provide what they deserve at this time.  I would like to regain custody after I am able to get housing."  The CSW gave Mother written notice and informed her of the date, time and place of the detention hearing.

The CSW removed Noah and I.T. from the shelter and transported them to a clinic for medical clearance.  While at the clinic, the CSW interviewed Noah.  When questioned about Father, Noah said he could not talk about him because Mother told him not to say anything about Father.  Noah told the CSW that he does not like men and that men do bad things to people.  Noah said he did not want any men to be around his sister.  Noah denied that any man ever touched his private parts.

Noah said Mother was good to him and his sister, and he claimed to feel happy and safe in Mother's care.  He said he loved Mother and wanted to be with her.  He would rather be with her than in a good place.

The CSW observed visible marks or bruises on Noah's arms.  There were red scratch marks on his left arm, as well as healed scratch marks on his right arm, indicating abuse.  Noah did state that Mother grabbed his arm because she was angry with him.

I.T. told the CSW, "'my mommy hits me on my head.'"  When the CSW asked I.T. if Mother hit her on the buttocks, I.T. said, "'no, on my head.'"  Being only three years old, she "was unable to articulate the details of any past experiences."  The CSW observed two- to three-inch healed linear scratches on I.T.  The CSW believed this

4

indicated abuse in that "the child sibling stated that mother scratched the child['s] back when she was angry."

The CSW learned that Father had been paroled in 2012. His current whereabouts, however, were unknown.

### C. *Commencement of Dependency Proceedings and Detention Hearing*

On August 21, 2013, DCFS filed a dependency petition on behalf of Noah and I.T., alleging they came within the jurisdiction of the juvenile court under section 300, subdivision (a) (physical abuse), subdivision (b) (failure to protect) and subdivision (j) (risk to sibling). Specifically, the petition alleged that Mother physically abused I.T. and Noah, placing each sibling at risk (counts a-1, a-2, b-1, b-2, j-1, j-2), that the parents have a history of domestic violence (counts a-3, b-3), and that Mother requested the children's removal from her care and stated she was suffering from depression and thus was unable to provide ongoing care and supervision of her children (count b-4).

At the detention hearing held the same day, neither Mother nor Father appeared. The juvenile court ordered the children detained in shelter care and ordered DCFS to exercise due diligence in an attempt to locate the parents. The court also ordered DCFS to provide the children and parents with family reunification services.

### D. *Events Preceding Adjudication Hearing*

On September 9, 2013, the CSW met with Mother. Mother had not seen or spoken to Father since his arrest in Michigan for domestic violence.

On September 24, 2013, Noah and I.T. were placed together in the foster home of Mr. and Ms. L. The children were very happy to be together. I.T. appeared very close to her brother.

On September 30, 2013, the juvenile court ordered Noah to receive therapeutic behavioral services and an individualized education plan. It further ordered DCFS to provide child care assistance.

5

On October 18, 2013, the juvenile court ordered Courtney Barr to be Noah and I.T.'s court-appointed special advocate.

## E. *Mother's Adjudication Hearing*

On October 31, 2013, the juvenile court adjudicated the matter as to Mother only based on the detention report and the jurisdiction/disposition report. Although a CSW had personally served Mother with notice of the hearing, Mother did not appear. The court therefore proceeded in her absence. The court sustained the allegations in counts a-1, a-2, b-1, b-2, b-4, j-1 and j-2, dismissed the allegation in count a-3, and found Noah and I.T. to be persons described in subdivisions (a), (b) and (j) of section 300. The court continued the matter for further adjudication on count b-3 as to Father, whose whereabouts still remained unknown, and for disposition.

## F. *DCFS Locates Father and Makes Contact with Maternal Grandmother*

DCFS subsequently located Father in a Michigan prison. During a telephone interview with Father on January 31, 2014, Father stated he was currently incarcerated because his parole had been revoked after he was involved in a physical altercation. Father revealed that he was awaiting the results of a psychological evaluation, that his current diagnosis was schizoaffective disorder, and that he was currently prescribed Trazodone, Cogentin and Prolixin. Father, whose maximum discharge date was April 14, 2028, said he was scheduled to be released upon completion of the assessment and a recommendation by the parole department. Father gave the CSW the address of the children's maternal grandmother as his mailing address following release.

The CSW wrote to the maternal grandmother, Mrs. H., asking that she contact DCFS. Mrs. H. called the CSW and reported that she had not seen or spoken with Mother for a couple of years, explaining that Mother left Michigan when she learned Father was going to be released from prison. When asked about Mother and Father's history of domestic violence, Mrs. H. said she knew Father had been arrested because he hit Mother. Mrs. H. also reported that Mother told family members that Father

6

threatened to kill her. According to Mrs. H., Father had been diagnosed with bi-polar disorder and has been in and out of prison because of his anger. In addition, he currently was in prison because he shot up his own mother's house.

## G. *Father's Adjudication Hearing and Mother's Contested Disposition Hearing*

Following numerous continuances, the juvenile court held Father's jurisdiction hearing and a contested disposition hearing on May 29, June 2, July 10, 14, 16 and 17, 2014. Father, who was unable to appear, was represented by counsel.[3] The children's foster parents, Mother, and Mother's therapist testified.

### 1. Foster Parents' Testimony

Noah was very angry and uncontrollable when first placed with his foster parents, Mr. and Mrs. L. In fact, Noah's behavior was "so bad" that Mr. L. wanted to ask DCFS to remove him. Noah did not follow any rules. He "screamed and hollered," fell on the floor, went under his bed, and hurt himself by biting his lip and mouth and by crawling around on his knees and by scraping his legs on the floor.

Noah lacked socialization. He did not get along with his fellow students at school, and the parents in the neighborhood would not allow him to come over because of his behavior. No one wanted to play with Noah, so Mr. L. kept him in the backyard to be safe.

"From day one," Mr. L. received calls from Noah's school. Noah fought with the students, would not stay in line, ran through the parking lot, and was disrespectful to school staff. Mr. L. went to school every day to be with Noah.

---

[3] On July 2, 2014, Father called the CSW and said he was scheduled to be released from custody on July 15, 2014. His parole was conditioned on, among other things, his compliance with mental health professionals, his participation in individual therapy and his taking of psychotropic medication as prescribed by a licensed physician. Father also could not leave Michigan. He stated he would like to be reunified with his children and was amenable to participating in court ordered services.

When Mother visited the children on October 6, 2013 in their foster home, I.T. was fine. Noah, however, had a tantrum and hid under the bed. Noah said he hated his mother, was going to fight her and kill her. After 15 or 20 minutes of coaxing by Mr. L., Noah came out and visited with his Mother.

In October 2013, Noah underwent two psychiatric hospitalizations and was prescribed medication. Mr. L. did not call Mother to let her know Noah had been hospitalized.

While in the care of Mr. and Mrs. L., Noah also received therapy, therapeutic behavioral services and wraparound services. As a result of the medication, therapy, and services, Noah's behavior improved both at home and at school. Noah was calmer, and his tantrums subsided. Noah even made a friend with whom he could play. Although Noah still got angry at times, his anger was not as extreme as it originally was. Mrs. L. noted that the improvement occurred during the time there was no contact with Mother.

Mrs. L. monitored Mother's telephone conversations with the children. On more than one occasion, Mrs. L. had to admonish Mother or redirect the conversation when Mother talked to Noah about what he could tell the therapist. Mother told Noah he did not have to talk to the therapist if he did not want to.

On another occasion, Mrs. L. walked out of the room to talk to her husband, thinking the phone conversation had ended. In fact, Noah and Mother continued to talk. During their next visit, Mother repeatedly asked Noah what Mrs. L. said after he got off the phone. Noah did not know because Mrs. L. was in another room. Noah started to cry because Mother kept asking him and he did not know.

Noah told Mrs. L. that Mother told him that he could not talk about their family and the past or they would not be together anymore. Noah also told Mrs. L. that Mother told him that she was going to ask the judge if he and his sister could live with Mother in the shelter. Noah subsequently asked Mrs. L. if Mother spoke to the judge and asked Mrs. L. to tell Mother he was not ready to leave yet. Mrs. L. referred the matter to Noah's therapist. Mrs. L. also overheard Noah tell I.T. not to talk about the past.

Around March or April 2014, after DCFS established a visitation schedule, both foster parents noted a change in Noah's behavior. Mrs. L. noted that once the contact resumed on a regular basis, Noah "went back to his first behaviors." Mr. L. received more calls from Noah's school. As a result, Mr. L. had to go to school more and interact more with the teacher.

Shortly before Mrs. L. testified, Noah held another child's head under water at the pool. Mrs. L. talked to Noah and explained that if he wanted to have friends, he had to talk to his therapist about what was hurting him and causing him to behave as he does. She encouraged him to deal with whatever was bothering him.

2. Mother's Testimony

Mother moved to Los Angeles in June 2011. Between that time and August 2013, she and the children lived in shelters or transition homes. Some of the shelters required them to leave in the morning.

Shortly after relinquishing custody of her children to DCFS, Mother checked herself into a hospital because she "was overwhelmed, depressed." She also had been told that going to the hospital would increase her chances of getting federal aid.[4] Following a psychiatric evaluation, Mother was found to be bipolar and was prescribed psychotropic drugs. Mother was told that she did not have to take the medication prescribed for bipolar disorder "if it made [her] feel weird or if [her] body wasn't comfortable with it." Mother did not have any other psychiatric hospitalizations.

Mother visited her children prior to their placement in the L. home. After they were replaced together with Mr. and Mrs. L., Mother visited on October 6, 2013 and Christmas. Mother's visits resumed in March 2014 after DCFS set up a visitation schedule.

---

[4]     Mother applied for supplemental security income benefits, but her application was denied.

When Mother arrived at the L. home for her visit on October 6, 2013, Noah ran off for about 10 minutes. He later came out of his bedroom and visited with her. Noah was upset and asked Mother why she did this to them. He said he did not like where he was and that it was Mother's fault that they were there.

Mother spoke to the supervising CSW about the manner in which Mrs. L. spoke to Noah and I.T. According to Mother, Mrs. L. "ruled with intimidation and . . . fear." When Mother talked to the children on the phone, she heard the caregiver in the background. On one occasion, Mother heard Mrs. L. say that Mother "need[ed] to stop treating Noah like a baby and treat him like a man." Mother also overheard the caregiver tell Noah, "Hang up the phone if your mother keeps saying stupid stuff."

During one of her visits, Noah told Mother that his caregiver told him "not to say anything to me or he would get in trouble." Noah began crying and asked Mother not to say anything. Mother hugged Noah and assured him he would not get in trouble. Mother did not persist in asking Noah questions.

During visits with the children, Mother asked them about their placement, school, and activities. She was not trying to uncover negative information about their foster family, and she did not promise them they would come home at a certain time.

When talking to Noah on the phone, Mother did not tell him what to say and not say to his therapist. Mother acknowledged telling Noah "to not tell everybody about our business." She explained that during their first visit at the DCFS office, I.T. told Mother that Noah told her that while she was in Mother's stomach that Father hit Mother. Mother told Noah not to discuss that with I.T. and that if he wanted to talk to someone he could talk to his therapist.

Mother further acknowledged that even before DCFS opened its case, she did tell Noah not to tell anyone about her past with Father. She did so because Noah would talk to strangers about the family's past. Mother believed this was inappropriate because "people can use that against you, so it's not safe."

Mother was unaware that Noah had been hospitalized twice. Mother learned what had happened after the fact. Mother informed Noah's therapist that she did not tell Noah

10

he could not talk to the therapist. Rather, Mother told Noah that if he wanted to talk, she would hold his hand in therapy but she would not force him to talk about a subject that he did not want to talk about. Mother testified that during the pendency of the case she has encouraged Noah to participate in therapy.

Mother was currently living in a single room occupancy residential building. Although she had tried to find housing, many of the available places were for a woman and children. Therefore, she would have to have her children with her to secure housing.

Mother was willing to participate in meetings regarding Noah's mental health and education. Mother stated that if the children were returned to her she would ensure that they continued to participate in their current services, she could continue her own individual counseling, and she would cooperate with DCFS regarding home visits.

### 3. Erika Sy's Testimony

Erika Sy was Mother's therapist at the Los Angeles Christian Health Center. Ms. Sy was supervised by Dr. Wayne Aoki, a licensed clinical psychologist. Ms. Sy met with Mother weekly for individual psychotherapy. They first met January 15, 2014, after which Ms. Sy reviewed the jurisdiction/disposition report. Based on this report, Ms. Sy diagnosed Mother with major depressive disorder and thereafter treated her accordingly.

Ms. Sy did not believe Mother needed a psychiatric evaluation, explaining that such a referral is made when the client needed to be medicated. Ms. Sy also opined that there was no need for Mother to undergo a court-ordered psychological evaluation. The therapist explained that Mother was diagnosed as mildly depressed in January. By March and April, Mother no longer met the criteria for depression, and her diagnosis was changed to "major depressive disorder in partial remission."

Mother told Ms. Sy that after she gave her children to DCFS, she was hospitalized for suicidal ideation without attempt. Ms. Sy was unaware of the diagnosis made at that time and would like to have had the benefit of reviewing those records. Although Ms. Sy was aware that Noah had behavioral issues and had ADHD, she did not know that Noah had been hospitalized for psychiatric issues on two occasions and was on psychotropic

11

medication. Mother told Ms. Sy that Noah verbalized that "he was very angry at her for giving him up to foster care." Mother also told Ms. Sy that Noah's behavioral problems were part of the reason she gave him to DCFS. Because of her housing instability, Mother did not feel she could get adequate care in school for Noah.

Ms. Sy never met the children or spoke with their therapists and never saw Mother with her children. Ms. Sy, therefore, could not offer an opinion as to how Mother parented or recommend that the children be returned to Mother. Ms. Sy believed, however, that Mother "ha[d] sound mental health to parent her children" and expounded that "she has the coping mechanisms in place to where she can handle stress" and "behavioral issues."

4. The Juvenile Court's Additional Jurisdiction Finding and Disposition Orders

After completion of testimony, the juvenile court sustained count b-3 of the section 300 petition, which alleged that Father punched Mother in the stomach when she was pregnant with I.T. The court then turned to the disposition issues. It found by clear and convincing evidence that substantial danger to Noah and I.T. existed and that there was no reasonable means to protect them without removal. The court removed the children from the custody of their parents and ordered reunification services for Mother and Father. The court granted Mother monitored visits with her children and ordered her to undergo a psychological evaluation pursuant to Evidence Code section 730.

## DISCUSSION

### A. *The Juvenile Court Properly Removed Noah and I.T. from Mother*

In *In re Ethan C.* (2012) 54 Cal.4th 610, our California Supreme Court set forth an overview of the dependency scheme. "Even after a dependency finding has been made, the statutory scheme is designed to allow retention of parental rights to the greatest degree consistent with the child's safety and welfare, and to return full custody and control to the parents or guardians if, and as soon as, the circumstances warrant. Thus,

12

the juvenile court may limit the parent's or guardian's supervision and control of the child in specified ways (§§ 361, subd. (a), 362), but it cannot remove the child from the parent's or guardian's physical custody, *except in cases of voluntary relinquishment of the child*, unless it finds, by clear and convincing evidence, that such custody would pose a substantial threat to the child of physical harm or sexual abuse, or that the child is suffering extreme emotional damage, and that there are no reasonable means of protecting the child's physical or emotional well-being short of such removal (§ 361, subds. (b)-(d).)" (*Id*. at p. 625, italics added.)

In this case, Mother *voluntarily relinquished* custody of Noah and I.T. to DCFS on August 16, 2013, albeit temporarily, because she was depressed and unable to provide for them. Whether this fact alone warranted removal is a question we need not reach because the juvenile court found by clear and convincing evidence the children would be in substantial danger if returned home and there was no reasonable means to protect the children's physical health without removing them from the custody of their parents.

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re Francisco D.* (2014) 230 Cal.App.4th 73, 83.) The court also "'"may consider a parent's past conduct as well as present circumstances."'" [Citation.]" (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.) On appeal, we review a disposition order removing a child from parental custody for substantial evidence. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574.)

As previously noted, Mother does not challenge the juvenile court's jurisdictional findings that she physically abused her children, that she requested that her children be removed from her custody because she was unable to take care of them, or that she and Father had a history of domestic violence. Rather, she claims that the juvenile court should not have removed Noah and I.T. from her custody because "she had learned the

13

warning signs of domestic violence and had applied safety principles both when she terminated her relationship with the children's abusive father and when she called the police and obtained a restraining order against a former boy friend." Mother also asserts that Noah and I.T. "were old enough to speak up if anything were amiss in the home" and she and the children were in therapy. Even accepting those assertions, substantial evidence supports the juvenile court's determination not to return the children to Mother at the disposition hearing.

Noah, who has exhibited severe behavioral problems and experienced two psychiatric hospitalizations, is a special needs child. Mother told her therapist that her decision to give her children to DCFS was due in part to Noah's behavioral challenges. Although the medication, therapy and services have been beneficial to Noah, the evidence shows that following interaction with Mother, Noah's behavioral problems worsen. This strongly suggests that Noah has unresolved issues with Mother and that his own emotional health would be at risk if not removed from Mother.

Although Mother has willingly participated in services designed to address case issues, Mother is not in a position where she is able to deal with Noah's special needs or to provide her children with the supervision and protection they require. At the time Mother contacted DCFS to relinquish her children, she stated she was "hopeless" and unable to take care of her children due to lack of income. She reported lifelong depression which continually worsened due to her homelessness. She also stated that Noah has a host of behavioral problems and that Mother needed help. These stressors on Mother's ability to cope with the challenges of caring for her children appear to be largely still present. Mother has yet to secure housing for her family, a job or other income.

Mother's own mental health is also a concern. As discussed more fully below, Mother has been diagnosed with mental health problems which she may not be addressing, and has engaged in behavior tending to undermine, rather than advance the children's progress toward resolving their behavioral issues. Mother has repeatedly told her children not to disclose their past to anyone, including the therapists assigned to help

14

the children.  We conclude substantial evidence supports the juvenile court's determination that the children needed to be removed from Mother's custody and could not be returned to Mother at the disposition hearing.

**B.  *A Psychological Evaluation Was Warranted***

Next Mother challenges the juvenile court's order requiring her to submit to a psychological evaluation under Evidence Code section 730.[5]  A court's decision to appoint an expert evaluator will not be disturbed absent an abuse of discretion.  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1012-1013; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 835.)  The juvenile court abuses its discretion when it "'exercise[s] its discretion in an arbitrary, capricious or patently absurd manner that result[s] in a miscarriage of justice.'"  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 448; *In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)

At the disposition hearing, counsel for Noah and I.T. asked the court to order an Evidence Code section 730 evaluation of Mother.  Mother's counsel objected to such an evaluation and asked if the court was ordering both a mental health evaluation and an Evidence Code section 730 evaluation; the court answered, "Yes, I think it's in Mother's best interest."  The court also ordered that Mother have a new therapist.

In September or October 2013, after Mother asked DCFS to take her children, Mother checked herself into a hospital where a doctor diagnosed her with bipolar disorder and prescribed psychotropic medication, which Mother claimed she did not have to take if she did not like the way it made her feel.  In January 2014, Mother began seeing Ms. Sy for therapy.  Although Ms. Sy testified that she did not believe a psychological

---

[5]     Evidence Code section 730 in pertinent part provides:  "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

evaluation was warranted because Mother's depression was in remission, Ms. Sy had not reviewed the records from Mother's psychiatric hospitalization, even though she was aware of it. This significant omission could reasonably give the juvenile court cause for concern as to whether it had an accurate picture of Mother's mental health.

With regard to Mother's actions, the juvenile court observed that "Mother's involvement has been counterproductive" and "Mother needs to understand, and that's the purpose for Mother's evaluations as well, is that she may not be doing all the right things for the children at this time, and I don't know that she appreciates that yet."

In light of the evidence before it, we conclude that the juvenile court acted within its discretion in ordering Mother to undergo a psychological evaluation pursuant to Evidence Code section 730. (§ 362, subd. (d)[6] [juvenile court is authorized to issue "reasonable orders to the parents" of a dependent child].)

## C. *The Juvenile Court Properly Ordered Visitation To Be Monitored*

It is the responsibility of the juvenile court "to define the rights of the parties to visitation by balancing the rights of the parent with the best interests of the child." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) "No visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) An order setting the terms of visitation is reviewed for abuse of discretion. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356;

---

[6] In its entirety, subdivision (d) of section 362 provides: "The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section, including orders to appear before a county financial evaluation officer. That order may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program operated by a community college, school district, or other appropriate agency designated by the court. A foster parent or relative with whom the child is placed may be directed to participate in such a program in cases in which the court deems participation is appropriate and in the child's best interest. The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."

16

*In re R.R.*, *supra*, at p. 1284; cf. *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497 [court reviews visitation order for abuse of discretion but applies the substantial evidence test to factual findings].)

DCFS advised the juvenile court of its concern that Mother's direction to her children not to talk about their past "will create a barrier to the children's progress in mental health treatment and it causes DCFS to be suspicious of what is being hidden." The evidence showed that, during visitation, Mother often asked Noah about his placement. Even when Noah said things were going well, Mother continued to question Noah about his placement, causing Noah to become angry. Despite attempts by the CSW to redirect Mother, the latter became angry and said she could ask her child whatever she wanted to ask. Mother responded similarly when told she could not talk to her children about returning home or discuss case issues. Following visits, Mrs. L. reported that Noah had behavioral problems at school. His therapeutic team believed that Noah's behavior resulted from Mother's promises that he and his sister would return to her.

Efforts by DCFS to curb Mother's inappropriate behavior were met with anger and disagreement. In May 2014, Noah's therapist advised DCFS that it was difficult to communicate with and counsel Noah because the child told him that Mother does not want him to talk to anyone about the past. The following month, another therapist reported that Noah told her at least two times during counseling sessions that Mother directed him not to talk about the past.

In light of the evidence of Mother's refusal to abide by DCFS's directive not to discuss case issues with the children and her repeated instructions to her children not to talk about their past, the juvenile court acted within its discretion in ordering Mother's visits with Noah and I.T. to be supervised.

17

## DISPOSITION

The order is affirmed.

STROBEL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18