Filed 7/14/21  Marriage of Waldron CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of LINDSAY and LAURENCE WALDRON. | |
| LINDSAY HANSEN, Appellant, v. LAURENCE WALDRON, Respondent. | G058896 (Super. Ct. No. 17D005437) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Scott B. Cooper, Judge.  Affirmed.

Holstrom, Block & Parke and Matthew R. Bogosian for Appellant.

King & Spalding, Laura Lively Babashoff, Arwen R. Johnson; Family Violence Appellate Project, Cory Hernandez, Jennafer D. Wagner, Shuray Ghorishi, Janani Ramachandran; California Women's Law Center and Amy C. Poyer for Appellant.

Law Offices of Lisa R. McCall, Lisa R. McCall, Erica M. Baca; Minyard & Morris and Michael A. Morris for Respondent.

* * *

This appeal arises out of a custody determination as part of a dissolution proceeding. Lindsay Hansen appeals from the trial court's order awarding her ex-husband, Laurence Waldron, joint legal and physical custody of their only daughter, Zoey.[1] In 2017, a domestic violence restraining order (DVRO) issued against Laurence, triggering a presumption under Family Code section 3044 that joint legal and physical custody was not in Zoey's best interests.[2] The court found that presumption had been rebutted, and Lindsay contends the evidence did not support that finding. Lindsay also contends the court erred in refusing to change Zoey's name from Zoey / Grace Hansen / Waldron to Zoey / Grace / Hansen Waldron (the forward slashes are not in the actual name but are merely indicative of the proposed change from a nonhyphenated middle name, to a nonhyphenated last name). We conclude the evidence supports the court's rulings and affirm.

FACTS

Lindsay and Laurence were married on June 26, 2010 and separated on June 29, 2017. They had one child, Zoey Grace Hansen Waldron, born in April 2017. Lindsay petitioned to dissolve the marriage on June 29, 2017, and the following day filed

---

[1] For the sake of clarity, and not out of disrespect, we will refer to Lindsay and Laurence by their first names.

[2] All statutory references are to the Family Code.

a request for a DVRO. A temporary restraining order (TRO) was issued on June 30, 2017.

Lindsay alleged numerous incidents in which Laurence, in a fit of rage, had destroyed property within the parties' home. In addition, she alleged that on February 23, 2016, Laurence had pulled her hair so hard that a clump of hair came out. She alleged that on October 30, 2016, while she was pregnant with Zoey, Laurence became upset, pushed her against a wall, and pinned her there.

The most recent incident had been on June 28, 2017, the day before Lindsay filed for divorce. On that day, Laurence was supposed to have alone time with Zoey. He was late, so Lindsay texted him that she was leaving with Zoey. Laurence was in the driveway as Lindsay walked away from the house, and he yelled at her to come back. Lindsay ignored him. Ultimately, after some argument, Lindsay agreed to let Laurence take the baby for two hours. They were both in their marital residence at the time, and Lindsay went upstairs to their bedroom and locked the door. A few minutes later, Laurence tried to get into the bedroom, upon finding the door was locked, he kicked the door hard enough to break it. Lindsay called the police, who asked Laurence to leave the home for the night.

At the evidentiary hearing, Lindsay testified about an incident that occurred shortly after the issuance of the TRO in which, after an exchange of Zoey, Lindsay drove away, eventually saw Laurence's vehicle behind her, and noticed that Laurence was recording her vehicle with his phone. Laurence testified he was simply going to his parents' house and decided to record her because he was afraid Lindsay would "twist the story of what was actually happening."

Following an evidentiary hearing in February 2018, the court issued its ruling on the request for a restraining order. The court considered evidence of prior domestic disturbances with girlfriends in the years 2000 and 2006 to be too remote to be significantly probative. The court also expressed some doubt about some of Lindsay's

3

allegations.  For example, regarding Lindsay's claim that Laurence pulled her hair so hard that a clump came out, the court found the evidence dubious.  Lindsay had also alleged that Laurence had thrown keys in anger that scratched her, but, again, the court found the photographic evidence to bely that claim.  Other incidents left the court with some doubts about whether Lindsay was as fearful as she claimed to be.  Nevertheless, the court found that on June 28, 2017, Laurence did perpetrate domestic violence.  The court issued a 3-year DVRO and ordered Laurence to enroll in a 52-week batter's treatment program.  However, it denied Lindsay's request to make Zoey a protected person under the order.  The court commented, "I did not hear things in this matter that would cause me to say . . . this individual should not be working . . . on a reasonable schedule to work his way up to plenty of parenting time with Zoey. . . .  I would make the finding in this case that the presumption, under [section] 3044, has been rebutted."[3]

At the time the initial TRO was issued, Zoey was under one year old and was still breastfeeding.  As a result, Laurence was given a relatively short window of visitation, totaling six hours per week.  His visitation was slowly ramped up over time.  In late July 2017, his visitation was increased to nine hours per week.  After the DVRO hearing, in June 2018, the parties stipulated to increasing Laurence's visitation to an average of approximately 24 hours per week, which included an overnight on alternating weekends.  In November 2018, the parties again stipulated to increase Laurence's visitation time, increasing it to approximately 41 hours per week, including one mid-week overnight every week, and maintaining the overnight on alternating weekends.  In

---

[3]     Section 3044, which plays a central role in this appeal, provides, "(a) Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020.  This presumption may only be rebutted by a preponderance of the evidence."

4

January 2019, the parties stipulated to increase Laurence's visitation time to approximately 65 hours per week, with his alternating weekends extending to three consecutive overnights. This amounted to Zoey spending an average of nearly 40 percent of each week in Laurence's care.

The trial from which this appeal arises occurred in November 2019 on the issues of physical and legal custody of Zoey, as well as Laurence's request to increase his visitation timeshare to 50 percent. Lindsay requested sole legal and physical custody of Zoey.

The first witness at the trial was Lindsay's father (Zoey's maternal grandfather) who had attended a number of visitation exchanges. In general, he testified that Zoey was a smart, animated, typical two-year-old who slept and ate well. He testified at some length concerning the incident that had come up in the prior DVRO hearing where Laurence allegedly followed Lindsay's vehicle and recorded her.

Afterward, the court offered the following guidance to the parties:

"So I just want to kind of discuss this issue generally before we move forward.

"How much of that D.V.R.O. hearing are we expecting to re-create here? I understand the 3044 presumptions. Judge Miller made the order he did, made the ruling he did. What I'm concerned—and my job now—one of my jobs, I should say, is to figure out whether or not [Laurence] can rebut that presumption based on what's happened—primarily based on what's happened since.

"I do need to . . . factor in somewhat the conduct, I suppose, of the finding in the first place, but what I don't want to be doing here is, as part of this custody-and-parenting-time trial, relitigating . . . the two- or three-day [domestic violence] hearing from early 2018.

"I don't know that I necessarily need any comments on that from counsel yet. It's just something I want to be sensitive to. We spent quite a bit of time from one

5

third-party witness, primarily on one incident from over two years ago that was already litigated in this case.

"I'm not trying to say that incident is irrelevant or inconsequential. All I'm saying is for purposes of getting through this this week, we're not going to be redoing the whole [domestic violence] trial, okay?"

Lindsay's counsel argued the court was required to consider domestic violence in assessing the best interest of the child and her health, safety, and welfare. The court agreed, but stated the question was the extent to which the domestic violence needed to be litigated. The court stated, "I could commit to even reading the transcripts from those proceeding[s] if it were to speed up this process here."

On a subsequent day of trial, the court clarified its comments: "When I make comments on the general relevance of certain types of evidence, for instance, the history of [domestic violence], the comments I make are not in any way sort of a limiting order in the way of precluding evidence. They are in the way of guidance for the parties as to what the court is thinking on those issues, to the extent that helps the parties prepare their presentations. [¶] The parties are still, of course, entitled to present whatever they want to try to present, and I'll rule on objections one at a time as they come, but I just wanted to make sure that there wasn't any misunderstanding on that."

Throughout the trial, Lindsay played a number of recordings she had made of Laurence. The first was a recording from August 2014 where Laurence said, "You took me over the fucking edge. I still shouldn't have thrown my fucking prescription, but I did." "If you have to go to court regarding anything in your life, your ass is going in jail because you can't shut your motherfucking mouth and just stop."

On October 1, 2016, Laurence was recorded yelling at Lindsay: "I am on my fucking edge. I'm afraid if I leave right now and if some guy gives me shit on the road, I'm afraid I'm going to fucking kill him. That's honestly how I feel right now cause I feel I need to take my aggression out on somebody." In that same conversation,

6

Laurence stated in reference to his future children, "Oh ya, I'm going to fucking slap them across the face. Guarantee it. That will get a slap across the face, without a doubt. Call the cops. I don't give a fuck. I will slap them. Not hard, but they'll get slapped. I'm old school. I ain't this fucking bullshit new school. Don't know what to tell you. Will they get spanked? You're goddam right they'll get spanked." In that same conversation, Laurence admitted he had previously had a problem with drinking every day at lunch, stating, "You got to drown it somehow, right?"

In August 2019, Lindsay recorded a conversation where she claimed Laurence said, "Stop being such a controlling bitch." The court listened to the audio, however, and could not hear Laurence make that statement. Lindsay testified that she had recorded about 50 percent of the custodial exchanges since the parties had separated, though she had no other recordings she intended to proffer as evidence.

Lindsay testified it was not in Zoey's best interest to award Laurence joint legal custody because they were unable to coparent and make joint decisions. She testified at some length regarding a conflict between her and Laurence over Zoey's enrollment in preschool. Laurence took the position that Zoey, at age 2, should not be in preschool full time but instead should spend more time with the parents, both of which worked from home. Lindsay took the position that the socialization and education was good for Zoey. She also testified about a disagreement they had about Zoey's developmental progress. At some point, the parents were asked by a pediatrician to fill out a survey regarding Zoey's development. Their answers were so divergent that the pediatrician reportedly found them useless. Lindsay also testified that they had disagreed about how long to have Zoey breastfeed.

Lindsay described Zoey as a normal two-year old, developmentally appropriate, and a mostly happy, smart child, who slept and ate pretty well. However, she refused to attribute any of Zoey's success to Laurence because she had "no idea what

7

[Laurence did] with [their] daughter." Nevertheless, she did acknowledge that it was important that Zoey spend time with Laurence "frequently and often."

Laurence testified he had never inflicted any form of corporal punishment on Zoey, had never physically touched Lindsay in an aggressive, forceful manner, had never spanked Zoey, and had never physically struck Zoey in any manner. Laurence agreed to an order for no corporal punishment. Laurence testified he had followed all of the terms of the DVRO, except he had come within a hundred yards of Lindsay when driving to his parents' house.

Laurence completed a 52-week batterer intervention program, never missing a day. He found that class very helpful as it taught him to recognize cues regarding anger and frustration, and gave him tools, such as taking time outs, that he has implemented not only with Lindsay but in his life more generally. Laurence also voluntarily took a 20-session in-person parenting class so he could learn how to communicate with Lindsay and balance structure for Zoey while she lived in two separate homes. He also took a 20-week anger-management class.

Laurence had previously attended two other batterer's intervention courses arising from criminal convictions for disturbing the peace. The first, in 2001, involved an incident where he caught his girlfriend with another man. The second incident occurred in 2006, when he keyed his ex-girlfriend's vehicle. He had no other arrests since that time. Before Zoey was born, the police had been to the parties' home three times, called by both parties, but there were no physical altercations and no arrests, and the police did not issue any temporary restraining orders.

Laurence joined the consensus in testifying that Zoey was a well-adjusted little girl, happy, and social, which he attributed to Lindsay and himself. He testified about Zoey's schedule with him, the types of things he does to care for Zoey, and fun activities they did together. Laurence testified about feeding, clothing, bathing, and generally caring for Zoey. Laurence testified his work schedule was flexible and he was

8

able to work from home. Laurence testified the only disagreement between the parents over Zoey's healthcare needs was about whether or not she was lactose intolerant and whether to get her tested for allergies; no doctor had diagnosed Zoey as lactose intolerant, but Lindsay believed she was.

Laurence testified about two ways in which not having legal custody was hindering his ability to care for Zoey. The first involved an incident in which, while in Laurence's care, Zoey developed a high fever. Laurence scheduled a medical appointment the next morning, but when he got there, the doctor refused to see Zoey because Lindsay had called the doctor's office and instructed them to refuse care. After getting lawyers involved, Laurence was able to reschedule the appointment for later in the afternoon with Lindsay sending her friend to attend the appointment while she observed over Facetime.[4] The second, more generally, was that Lindsay refused to give him a copy of Zoey's medical insurance card. Lindsay's justification for that was that it contained her employer information, but on cross-examination she admitted that her employer information was already publicly accessible through filings in the divorce case.

The only other witness was Dr. Grossman, who had conducted a single session of coparenting counseling with the parties before deciding to discontinue the counseling. Dr. Grossman testified that in the single session the parties acted appropriately, but afterward Lindsay contacted Dr. Grossman individually and displayed signs of fear and post-traumatic stress disorder, at which point Dr. Grossman felt it was not in the parties' best interests to continue.

After the trial, the court granted Laurence joint physical and legal custody of Zoey. The court applied the presumption against custody found in section 3044, discussed each of the factors listed, and found that Laurence had rebutted the presumption.

---

[4] Facetime is a phone application for making video calls.

With regard to the alleged incident at an exchange where Lindsay claims Laurence called her a bitch, the court found that the "proven content" of that conversation did not violate the DVRO. As alleged, it was "at least a technical violation of the order" which "the court does not in any way condone or excuse . . . , particularly in front of Zoey, and the court would specifically admonish [Laurence] that he is under a continuing obligation to engage only in brief and peaceful communications at any exchanges at which [Lindsay] and [Laurence] are present. [¶] The court will note, however, that this was one conversation at one out of the multiple dozens of exchanges that have happened since the issuance of the restraining order. [¶] Looking at all of that evidence, balancing all of those factors, and giving each of the factors the weight the court feels it deserves, the court finds, pursuant to [section 3044, subdivision (B)], that, on balance, the six factors support the legislative findings in . . . section 3020."

Regarding the incident from 2017 where Laurence recorded Lindsay in violation of the TRO, the court commented, "The court is not excusing this conduct and is not saying it does not constitute a violation of at least the T.R.O., but, in balancing all of the factors, including the overall context and seriousness of the violations . . . the court finds that the overall context and seriousness of those violations is relevant to the court's decision as to whether the 3044 presumption has been rebutted."

More generally, the court found that awarding joint legal custody is in Zoey's best interests. Lindsay "cites to the fact that this is a high conflict case and that the parties are unable to co-parent effectively and that there is a power imbalance due to the domestic violence issues. The primary evidence of the parties' alleged inability to co-parent and the high conflict nature of this case is the Our Family Wizard messages, of which the court has 1,958 messages, spanning over 540 pages between October 21, 2017, and November 13, 2019; approximately a two-year period that begins before the issuance of the restraining order and continues almost two years thereafter. [¶] Throughout the trial, only a few of those exchanges were singled out as showing extreme conflict or

10

inability to co-parent. However, the messages, when taken as a whole, the court believes shows that the parties actually, for the most part, are able to co-parent, and have attempted to do so. [¶] That is not to say the case is without conflict or that the co-parenting has been without conflict, but the court does not find this conflict to be so severe or there to be a power and control issue that would cause the court to find that a sole legal custody order is in Zoey's best interests." "The court finds that it is in Zoey's best interests, considering all the factors, including those in 3011 and 3020, for both of these parents to make decisions as to her health, education, and welfare going forward, and that it would be of benefit to her to have the parents' different opinions, different parenting styles, . . . to affect her health, education, safety, and welfare moving forward." "Accordingly, the court finds, for all the preceding reasons, that the 3044 presumption is rebutted in this case, and the court will order joint legal custody."

As to joint physical custody, the court commented, "Frankly, as to physical custody, the court finds that the current arrangement between the parties is really de facto joint physical custody, but the court will make it official today in terms of an order."

Finally, addressing Lindsay's last-minute request to change Zoey's name from an unhyphenated middle name to an unhyphenated last name, "Hansen Waldron," the court found that such a change would not be in Zoey's best interests and denied the request.

Based on Lindsay's request, the court issued a statement of decision. Lindsay did not object to any portion of the statement of decision. Lindsay timely appealed.

11

DISCUSSION

1.  Governing Legal Principles

Normally, custody is determined pursuant to section 3022, which vests a trial court with broad discretion to make any custody order that "seems necessary or proper." (*Ibid*.)  That discretion is guided by the two policy preferences described in section 3020.  Subdivision (a) provides, "The Legislature finds and declares that it is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children.  The Legislature further finds and declares that children have the right to be safe and free from abuse, and that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child."  Subdivision (b) provides, "The Legislature finds and declares that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child, as provided in subdivisions (a) and (c) of this section and Section 3011."  To the extent there is a conflict between subdivisions (a) and (b), subdivision (c) provides that subdivision (a)—the health, safety, and welfare of the child—is the paramount consideration.  (*Id*, subd. (c).)

Ordinarily, "This section establishes neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody, but allows the court and the family the widest discretion to choose a parenting plan that is in the best interest of the child, consistent with this section."  (§ 3040, subd. (d).)  Where one of the

12

parties has engaged in domestic violence, however, the Family Code does establish such a presumption.

Pursuant to section 3044, subdivision (a), "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, or against the child or the child's siblings, . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020. This presumption may only be rebutted by a preponderance of the evidence."

Section 3044, subdivision (b) sets forth the standards for rebutting the presumption. The structure of that subdivision is that it lists one factor, subdivision (b)(1), that must be satisfied: "The perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child pursuant to Sections 3011 and 3020. In determining the best interest of the child, the preference for frequent and continuing contact with both parents, as set forth in subdivision (b) of Section 3020 . . . may not be used to rebut the presumption, in whole or in part." It then lists six additional factors that must "on balance, support the legislative findings in Section 3020." (*Ibid.*) Those factors are: "(A) The perpetrator has successfully completed a batterer's treatment program that meets the criteria outlined in subdivision (c) of Section 1203.097 of the Penal Code. [¶] (B) The perpetrator has successfully completed a program of alcohol or drug abuse counseling, if the court determines that counseling is appropriate. [¶] (C) The perpetrator has successfully completed a parenting class, if the court determines the class to be appropriate. [¶] (D) The perpetrator is on probation or parole, and has or has not complied with the terms and conditions of probation or parole. [¶] (E) The perpetrator is restrained by a protective order or restraining order, and has or has not complied with its terms and conditions. [¶]

13

(F) The perpetrator of domestic violence has committed further acts of domestic violence." (*Id*., subd. (b)(2)(A)-(F).)

"We review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the [trial] court's factual findings. (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497.)

2. Analysis

Lindsay's arguments on appeal fall into three general categories: arguments that misrepresent the record, arguments that fail to acknowledge the standard of review, and arguments that are waived due to Lindsay's failure to object to the proposed statement of decision in the trial court.

Beginning with the arguments that misrepresent the record, Lindsay contends "the trial court abused its discretion by denying mother the right to present all evidence of domestic violence." That never happened. Lindsay points to the court's comments that it did not want to relitigate the entire domestic violence proceeding from 2018. But Lindsay has not pointed to a single piece of evidence or testimony that was excluded. And the court was clear that its comments were not in the nature of an in limine order, but instead were general guidance, and that the parties were free to proffer any evidence and the court would rule on objections as they arose.

Next, Lindsay contends "the trial court abused its discretion by excusing father's intentional violation of restraining orders." That never happened either. Quite to the contrary, with regard to the improper recording, the court literally said the opposite: "The court is not excusing this conduct and is not saying it does not constitute a violation of at least the T.R.O." With regard to allegedly telling Lindsay to "stop being such a controlling bitch," the court stated, "[T]he proven content of that conversation does not necessarily violate the restraining order, but, as alleged by [Lindsay], that language could constitute non-peaceful contact during an exchange which would constitute . . . at least a

14

technical violation of the order."  The court simply determined that, on balance, given the timing and nature of the violation, it did not outweigh the evidence tending to rebut the presumption under section 3044.  That was entirely proper.  Compliance with the terms of a restraining order is one of the section 3044, subdivision (b)(2) factors for which the court must consider whether "on balance" they support the legislative policies set forth in section 3020.  The court engaged in that balancing, and Lindsay has not shown any abuse of discretion.

Lindsay next contends "the trial court abused its discretion by failing to identify precise exchange locations in the restraining order."  This contention fails for two reasons.  First, the court did specify the precise time and location of exchanges.  It set a specific visitation schedule for each parent, down to the hour.  And it specified that exchanges occur at Zoey's school, or, if she was not in school, at the sheriff's station.  Second, although this schedule is specified in the statement of decision and not in the restraining order itself, Lindsay has not cited any authority requiring as much.  Lindsay cites section 6323, subdivision (c), which states, "When making an order for custody or visitation *pursuant to this section*, the court's order shall specify the time, day, place, and manner of transfer of the child for custody or visitation to limit the child's exposure to potential domestic conflict or violence and to ensure the safety of all family members." (Italics added.)  The court did not make its custody order pursuant to section 6323, which applies to *ex parte* domestic violence restraining orders.

Next, Lindsay contends, "The trial court abused its discretion by ignoring evidence of [Laurence's] admitted alcohol abuse."  She points to the recording from 2016 where Laurence admitted to, sometime in the past, drinking every day at lunch.  The flaw in Lindsay's argument is she makes no effort to conform her argument to the standard of review on appeal.  The substantial evidence standard requires us to resolve all reasonable inferences in favor of the judgment, not against it.  (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24.)  The fact that Laurence admitted to drinking daily

15

three years in the past does not compel a conclusion, as a matter of law, that (1) he was still drinking daily at the time of trial, or (2) that he required counseling as a matter of law. There was no evidence that Laurence had consumed any alcohol after 2016. That was enough to support the court's ruling.

The same flaw undermines Lindsay's argument that "[t]he trial court abused its discretion by ignoring [Laurence's] disregard for the health, safety and welfare of the child." The only evidence Lindsay points to is Laurence's angry tirade in 2016 when he claimed he would slap his children and generally employ corporal punishment. It is another misrepresentation to say the court "ignored" this evidence when the court explicitly acknowledged it and described it as "somewhat disturbing." The court went on, "But that was back in 2016, and there's no evidence that . . . those proposed corporal punishment parenting styles . . . ha[ve] ever actually been acted upon or that Zoey has ever been subjected to anything like that by [Laurence]." As with the previous argument, Lindsay does not acknowledge the substantial evidence standard and its corollary that we draw all reasonable inferences in favor of the judgment. Laurence testified that he had never used corporal punishment on Zoey and agreed to an order prohibiting such use. That was substantial evidence to support the judgment.

Similarly, defective is Lindsay's argument that "[t]he trial court abused its discretion by finding that the word 'bitch' does not disturb a victim's peace." This assumes, contrary to the court's finding, that Laurence actually used the word "bitch" at an exchange in 2019. The court did not credit the evidence that Laurence actually used that word. Lindsay points to the statement of decision, where the court said, "While the Court does not condone or excuse any such alleged conduct, especially in front of the child, *the Court does not find these incidents, as alleged, amount to violations of existing Restraining Order*." (Italics added.) We note that this portion of the statement of decision is not entirely consistent with the court's comments on the record. On the record, the court stated, "As to the August 2019 conversation at the exchange, the proven

16

content of that conversation does not necessarily violate the restraining order, but, as alleged by [Lindsay], *that language could constitute non-peaceful contact during an exchange which would constitute . . . at least a technical violation of the order*." (Italics added.)

Regardless of the conflict in the court's statements, the bottom line is this: we can only reverse errors that are prejudicial. (Cal. Const., art. VI, § 13.) Here, even assuming the court erred in concluding that the statement *as alleged* did not violate the restraining order, the court's alternate holding was that Lindsay failed to prove Laurence actually made that statement. The court listened to the audio recording and made a specific finding that the alleged statement "stop being a controlling bitch" could not be heard. It then found that the "proven content" of the conversation did not violate the restraining order. Lindsay makes no attempt to undermine that finding, which renders the assumed error harmless.

Lindsay's final argument is that "[t]he trial court abused its discretion by ignoring domestic violence on mother's name change request." In addressing a name change request, the "the sole consideration . . . should be the child's best interest." (*In re Marriage of Schiffman* (1980) 28 Cal.3d 640, 647.) In making this determination, the court may consider the following factors: "the length of time that the child has used a surname is to be considered. [Citation.] If, as here, the time is negligible because the child is very young, other facts may be controlling. For instance, the effect of a name change on preservation of the father-child relationship, the strength of the mother-child relationship, and the identification of the child as part of a family unit are all pertinent. The symbolic role that a surname other than the natural father's may play in easing relations with a new family should be balanced against the importance of maintaining the biological father-child relationship. '[T]he embarrassment or discomfort that a child may experience when he bears a surname different from the rest of his family' should be evaluated." (*Ibid.*)

17

Here, the court explicitly considered the *In re Marriage of Schiffman* factors. It found that, given Zoey's young age, the length of time she had used the name was not controlling. It found that the remaining factors all favored denying the request. The court also noted that it was the parties themselves who had agreed on Zoey's surname, and that "having an unhyphenated double last name" would involve "practicalities moving forward" that weighed against her best interests.

Lindsay's contention that the trial court "ignored" domestic violence is somewhat ambiguous. Obviously, the court was aware of the domestic violence. The entire trial was shaped by it. Moreover, the court had already considered Zoey's best interests—and the impact of domestic violence on that inquiry—when determining legal and physical custody.

To the extent Lindsay is contending the court was required to make a finding on the record about how domestic violence impacted the name change request, she forfeited that argument by failing to object to the statement of decision. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 ["The statutes thus describe a two-step process: first, a party must request a statement of decision as to specific issues to obtain an explanation of the trial court's tentative decision [citation]; second, if the court issues such a statement, a party claiming deficiencies therein must bring such defects to the trial court's attention to avoid implied findings on appeal favorable to the judgment"].) Lindsay has not cited any authority requiring such an explicit finding, but to the extent such a finding was required, we infer it.

To the extent Lindsay is contending that the domestic violence compelled the court to change Zoey's name upon her request, there is simply no authority to support that proposition. If a finding of domestic violence does not compel a finding concerning physical and legal custody, it certainly should not compel any particular result in a name change request, which is comparatively less impactful. And this case presents a persuasive reason to reject such a categorical proposition: Laurence is, by all indications,

18

a loving and attentive father notwithstanding his earlier transgressions. A name change is not necessarily in Zoey's best interests for the reasons the court stated.

DISPOSITION

The judgment is affirmed.[5] Laurence is awarded his costs on appeal.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.

---

[5] Lindsay's motion for judicial notice of her "Objections to Proposed Judgment on Reserved Issues" is denied. That document was filed nine months after the notice of appeal and pertains to a judgment not at issue in this appeal.