Filed 10/30/14

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| In re the Marriage of ELENITA L. and ROMER N. FAJOTA. | |
|---|---|
| ELENITA L. FAJOTA, | D064816 & D065118 |
| Appellant, | (Super. Ct. Nos. D542803 & DV031757) |
| v. | |
| ROMER N. FAJOTA, | |
| Respondent. | |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Robert S. Longstreth and Michael S. Groch, Judges.  Reversed.

Reed, Smith, Anne M. Grignon, Margaret A. Grignon; San Diego Volunteer Lawyer Program, Inc., Kris Lee Jacobs; Family Violence Appellate Project and Erin Canfield Smith, for Appellant.

Romer N. Fajota, in pro. per., for Respondent.

# I.

## INTRODUCTION

Elenita L. Fajota appeals from an order of the trial court granting her ex-husband, Romer N. Fajota, joint legal custody of the couple's three children. According to Elenita, Romer admitted to engaging in acts of domestic violence, and the trial court found that Romer had committed domestic violence against her. Elenita contends that in awarding Romer joint legal custody, the trial court failed to apply the rebuttable presumption set forth in Family Code[1] section 3044. Section 3044 provides that it is not in a child's best interest to award joint or sole legal and/or physical custody to a parent who has been found to have committed domestic violence against the other parent, the child, or the child's siblings.

We agree with Elenita that the trial court abused its discretion by failing to apply the mandatory presumption set forth in section 3044 when it determined that the parties would share joint legal custody of the children. We therefore reverse the custody order of the trial court contained in the judgment of dissolution, and remand the matter to the trial court to apply the mandatory presumption in determining the custody of the children.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

Elenita and Romer married in June 2005 and have three minor children together. Beginning in 2006, Romer became physically violent with Elenita. Romer committed

---

[1] Further statutory references are to the Family Code unless otherwise indicated.

acts of violence against Elenita even while she was pregnant with their second child.

Between 2006 and 2008, Romer would charge at Elenita, throw things at her, destroy her

belongings, and push her until she fell. Elenita obtained a restraining order against

Romer in 2007 after a particularly violent episode. Romer was arrested in 2008 after he

grabbed Elenita's hair, jerked her head forward and back, and caused her head to hit a

wall.

By the end of 2008, Elenita had moved to Texas with the children and the couple

separated. Romer subsequently also moved to Texas. The parties divorced in Texas in

2010.

Elenita and Romer later reconciled. Elenita believed that Romer had changed.

Elenita, Romer, and the children moved back to California in the spring of 2012, and

Elenita and Romer remarried in October of that year. Three months later, Elenita learned

that Romer had been unfaithful. When Elenita told Romer that she wanted another

divorce, he again began engaging in physical violence and emotional abuse directed at

her. At various points in time, Romer called Elenita "stupid," threw an iPad at her, threw

a burrito at her, and threw an iPhone at her. In February 2013, while Elenita was driving,

Romer became angry over something that Elenita had said. He struck her on the head

and ordered her to "shut up, and don't talk about me like that ever again."

In approximately March 2013, Elenita told Romer that their relationship was over.

However, they continued to live together in the family home. In April, Romer and

Elenita got into an argument. Romer ordered Elenita not to leave the house. When

3

Elenita picked up the car keys in preparation to leave, Romer came up behind Elenita and grabbed her. Romer was yelling at her. He pinched her hand so hard that it began to bleed. Two of the children were present during this incident, and one of the children began to cry. When Elenita threatened to call the police, Romer stopped the abuse and started being nice to her. Later that day, while Elenita was picking up two of the children from school, Romer moved out of the house.

In addition to the abuse that Romer has perpetrated against her, Elenita has witnessed Romer spanking the children "multiple times in a row" and has noticed the children "ducking and covering" when in Romer's presence.

Elenita filed a Request for Domestic Violence Restraining Order against Romer in April 2013. She also requested that the court award her sole legal and physical custody of the children. Elenita filed a declaration in support of her requests in which she detailed Romer's abuse from 2006 to the present. The court issued a temporary restraining order, effective from April 29, 2013 to May 15, 2013, and awarded temporary sole legal and physical custody to Elenita, pending a hearing on the request for a permanent restraining order.

Romer filed a declaration in response to Elenita's request for a domestic violence restraining order in which he admitted to virtually all of the physical contact that Elenita had detailed. However, he disputed the extent of the harm that he had caused by this contact.

4

Elenita filed a petition for dissolution of the marriage on May 14, 2013. She requested sole legal and physical custody of the children, and filed a declaration in support of the request in which she detailed the history of Romer's acts of domestic violence.

The trial court, Judge McAdam,[2] held a hearing on Elenita's request for a restraining order on May 15. Elenita testified about many of the incidents of abuse. Romer also testified. He admitted that he had grabbed keys from Elenita during one of the incidents, and also admitted to hitting her on the back of the head in the presence of the children. When asked to rate the severity of that incident on a scale of one to five, with "five being knock somebody out with a slap, one being sort of a love tap," Romer said that it was a "two or three just so she would stop bad mouthing [him]." Romer also admitted that he had spanked the children.

At the conclusion of the hearing, the court found that Romer had engaged in acts of domestic violence. However, the court denied Elenita's request for a permanent restraining order, explaining,

> "[Elenita] clearly [has] a reason to request a permanent restraining order, you know what I mean. No matter what Mr. Fajota may say or think I think finally you've realized enough is enough, I'm not going on with this. I've got the kids. Even though we're still going to be parents together, we're not going to live together anymore. [¶] . . . [¶] Is that right? [¶] . . . [¶] So I'm not going to grant you the request for a permanent restraining order. It is not that I don't

---

2    Although it is not generally our custom to identify judges by name, in order to give proper context to the procedural history of this case we consider it helpful to identify the several different judges who made the various rulings.

5

think that you've met the legal requirements, I have to say that, I'm reluctant to say that, I hate to do that but I am saying it because I don't feel that there is any fear going forward with Mr. Fajota. [¶] . . . [¶] It is not—a restraining order is not a penalty, it is not like a criminal case. It is: do I think that that person needs protection going forward. I honestly believe that he doesn't [sic] for two reasons: [¶] One, I think he's going to listen to what I have to say. [His attorney] is going to make sure he abides by it. [¶] The other reason is his family is here, right. [¶] . . . [¶] You know, and obviously if they have taken him in the house, that's a big deal to me. A lot of times I get parents that won't let their kids come home, they go, no way I'm not letting that kid in my house. They're not going to let him in the house. And I think his parents are going to make it real clear to him."

Later, the court said to Elenita, "He's not going to hit you in the head to get your attention anymore."

Despite denying Elenita's request for a permanent restraining order, the court ordered that the dissolution action, which was pending in a different department, be transferred to his department and consolidated with the domestic violence restraining order action. The court awarded Elenita sole and exclusive use of the family residence, and stated, in Romer's presence, "What that means is that you [Elenita] have the sole and exclusive use, no one gets to go in that house any more without your permission." The court then said, "We'll work out some schedule to see the kids but if he violates and says, I want to be able to go in and get this and that, it's my house too, no it is not. Until a further order of the court, it is yours [Elenita], that's it. Period. [¶) . . . [¶] Do you think he hears me say that? I think he does. And that is really important to me. I don't want you to be afraid of him."

6

After the court declined to issue a permanent restraining order, the parties stipulated to a temporary parenting plan pursuant to which Romer would have the children on alternate weekends and would also have one mid-week afternoon visit with them.

The following day, Judge McAdam issued an order entitled "Corrected Non-Appearance Ex-Parte Minute Order," which noted that on May 15, the court had entered an order that affected the custody and visitation of the parties' children, and had ordered that the domestic violence and family law proceedings be consolidated. However, because Judge McAdam had engaged in an ex parte communication with Elenita's attorney on a procedural matter, Judge McAdam reversed the portion of the May 15 order regarding custody and visitation.[3] Judge McAdam reconfirmed the order consolidating the cases and concluded that further proceedings should be held in the family court before Judge Groch.

The parties attended a Family Court Services (FCS) conference in June 2013. FCS issued a parenting plan/mediation report (the FCS report) that noted the domestic violence allegations. In addition, the FCS report acknowledged that Romer had admitted

_____

[3]    The record does not include any written order issued by Judge McAdam on May 15 that "affected the custody and visitation of the parties' three minor children," and it is not clear as to what Judge McAdam's May 16 order is referring in stating that the court made an order regarding the custody and visitation of the parties' children. It is possible that the court was referring to an apparent stipulation, read into the record by one of the parties' attorneys, regarding a temporary agreement concerning the parents' division of time with the children. However, the record does not clearly establish that this stipulation was adopted as an order of the court.

7

to having engaged in domestic violence against Elenita. The FCS report further noted that there had been three reports of child abuse against Romer to Child Welfare Services, including one that month based on Romer's admission that he had struck the children with a belt. Despite the history of domestic violence perpetrated by Romer, the FCS report recommended that the court grant the parties joint legal custody.

Judge Longstreth[4] held a hearing on the dissolution proceedings on July 12, 2013. Romer did not attend this hearing. While Elenita agreed with much of the FCS report, she did not agree with the recommendation that the parties share joint legal custody. Elenita requested sole legal custody on the ground that there had been domestic violence in the relationship, "which [Romer] has admitted to, and it is also listed in the [FCS] report."

In response to Elenita's request, the court stated, "That is kind of a strange order for me to make when the most current request for a restraining order was denied." Elenita's attorney responded, "I understand that, Your Honor. We didn't agree with the denial of the restraining order. There was [an] admission of all the abuse, including the most recent abuse." The court replied, "I understand that, and that's your right to disagree

4    The minute order issued with respect to this hearing identifies the judge who presided over the hearing as Judge Longstreth. The "Findings and Order After Hearing" also identifies Judge Longstreth as having presided over the July 12 hearing, although the document was signed by Judge Maureen F. Hallahan. However, the reporter's transcript for the July 12 proceeding identifies Judge Groch as presiding over the proceeding. Given that the minute order and "Findings and Order After Hearing" both identify Judge Longstreth as having presided over July 12 hearing, we will refer to Judge Longstreth as the judge for that proceeding. The record does not disclose why this hearing may have been held in Judge Longstreth's department, rather than in Judge Groch's department.

with that, but I think that I need to go with what the findings were, not with what you wish they were." The court continued, "So I will adopt the [FCS] report, including the joint custody/legal custody provision. So the recommendations by the [FCS] counselor in the June 21st, 2013 report, pages 6 though 10, paragraphs 1 through 9 with subparagraphs, those are adopted as an order of the court." The trial court issued its order adopting the FCS report's recommendations on August 7, 2013. Pursuant to the FCS report that was adopted by the court, Romer was required to complete a six-week parenting class by October 2013.

Elenita filed a timely notice of appeal from the court's August 7, 2013 order.

Elenita filed a second request for a domestic violence restraining order against Romer on September 23, 2013. In her request, Elenita detailed harassing conduct that Romer had engaged in since the May 2013 hearing on her previous request for a restraining order. According to Elenita's declaration, sometime over the weekend of September 20, 2013, without Elenita's permission or knowledge, Romer entered the home that the court had designated for Elenita's sole and exclusive use. Romer had apparently known that Elenita would be out of town that weekend. Romer removed various items from the house, including Elenita's bed frame, mattress, television stands, two couches, a miniature refrigerator, a laptop computer, several DVDs, and other personal belongings. After Elenita discovered what Romer had done and informed him that he was not allowed to be in her home, he sent her a text message claiming that he had "[a]lready

9

cleared it with [the police department]. I'm good. So like your attorney told me with the reunion, if you don't like it, take me to court."

Elenita called the police to file a report, and was informed that Romer had not been escorted by a police officer when he entered her home. Elenita declared that she "do[es] not feel safe in [her] home, knowing that [Romer] does not respect boundaries and feels he can do whatever he wants to harm [her] without fear of consequences."'

According to Elenita's declaration, Romer continued to berate Elenita, calling her names like "slut," 'whore," "bitch," and "idiot," and threatened to take the children away from her. Romer also began demanding money or sexual favors from Elenita "in exchange" for taking care of the children, even during his court-ordered parenting time.

The couple's oldest child told Elenita that Romer had questioned him about Elenita's comings and goings, and that Romer had asked who takes care of the children when Elenita is not at home. The child reported that if he did not respond, Romer would spank him.

Early one morning in August 2013, at 3:00 a.m., Romer sent Elenita a text message that caused her to believe that Romer had been watching her. In the text message, Romer referred to a male friend who had visited Elenita the previous evening. On another occasion, Romer questioned Elenita, through text messaging, as to whether she was allowing other men to be around the children in her home. Romer warned Elenita that if she had a " 'new dude' " watch the children, Romer would " 'put him in the hospital.' "

The trial court issued a temporary restraining order requiring that Romer stay at least 100 yards away from Elenita, her home, her place of work, and her vehicle, and set a hearing on Elenita's request for a permanent restraining order for October 15, 2013.

Prior to the hearing on Elenita's request for a permanent restraining order, on October 2, Elenita filed a request that the court enter a default against Romer in the dissolution proceeding. The clerk of court entered a default against Romer that same day.

Romer filed a response to Elenita's request for a domestic violence restraining order. In his response, Romer conceded that he had entered Elenita's home with three friends. Romer maintained that he had entered Elenita's bedroom in order to take things that he claimed belonged to him. Romer contended that Elenita was seeking a restraining order in "retaliation" for his having entered her home. He admitted that he had threatened to take the children away from her, and acknowledged that he had "demanded money from her" for watching the children. Romer also admitted that he had sent the 3:00 a.m. text message. Romer disputed that he had ever "threatened" his son in order to obtain information about Elenita. On the same day that Romer filed his response to Elenita's request for a restraining order, he also filed a request for an order to set aside the default in the dissolution action. In addition, in the final paragraph of his pleading, Romer requested that the court address child custody and visitation, asserting that he had been watching the children 80 to 85 percent of the time.

At the hearing on October 15, at which Judge Groch presided, Romer again admitted that he had entered Elenita's home without her knowledge. He acknowledged

11

that he still had a key to the home. Judge Groch expressed surprised that Romer was "back so soon doing these things," after "Judge McAdam gave you a break and took you at your word that that nonsense is over, and it looks like nonsense to me still." Romer responded, "I felt it was within my rights to still go back there and get my stuff, my personal belongings . . . . [T]his restraining order is just to get back at me because I went there to get my belongings." The court replied, "It sounds like you keep doing things on your terms instead of court terms and by agreement with [Elenita]." The court asked Romer about the court-ordered parenting class that he was supposed to have completed. Romer told the court that he was enrolled in a five-week parenting course. There was no discussion regarding the fact that Romer was to have *completed* a six-week parenting class by October 2013.

At the conclusion of the hearing, the court  issued a one-year restraining order, ordering that Romer stay at least 100 yards away from Elenita, except for "[b]rief and peaceful contact" with Elenita and the children "as required for court-ordered visitation of [the] children." However, the court did not revisit the award of joint legal custody, despite having issued a restraining order against Romer based on domestic violence. At the hearing, the court told Romer, "We will give you a copy of Family Code section 3044 because there's [sic] consequences of a restraining order. There's a presumption against custody, joint custody and visitation." Although the court recognized the existence of the presumption against joint custody, the court did not apply the presumption in making its custody order. Instead, the court stated, "If you currently have joint, legal custody—at

12

this point, I'll leave that in place."  The court then told Romer, "In order to overcome [the] presumption of Family Code section 3044, you need to attend [a] high-conflict parenting program, at least six sessions in length."  After some further discussion about other classes, the court said, "I'm going to give you six months [of a] high-conflict co-parenting [class] because I want you to follow the prior orders and also be a condition of overcoming that Family Code section 3044 presumption.  So you need to do this to make sure you're eligible to have joint[] legal custody."

After reiterating the details of the restraining order, the court entered a judgment of dissolution, terminating the parties' marriage.  That judgment ordered that Elenita would have sole physical custody, with visitation for Romer, and that the parties would share joint legal custody of the children.  The trial court's judgment incorporated the August 7, 2013 Findings and Order After Hearing, which also awarded Romer joint legal custody.

Elenita filed a second notice of appeal, this one from the judgment of dissolution entered on October 15, 2013.  This court ordered the two pending appeals filed by Elenita consolidated for briefing, argument, and decision.[5]  Only Elenita has filed a brief on appeal.

---

5    Although Elenita filed two separate notices of appeal, and the appeals have been consolidated in this court, Elenita has not established that the first notice of appeal was taken from an appealable order.  Specifically, it is not clear that the court's August 7, 2013 order was a final order regarding custody.  (See *Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1089 ["[I]t is well settled that temporary custody orders are nonappealable"]; *id.* at p. 1090 [" 'A temporary custody order is interlocutory by definition, since it is made

13

DISCUSSION

Elenita contends that the trial court erred in failing to apply the presumption set forth in section 3044, which provides that awarding sole or joint physical or legal custody to a parent who has committed domestic violence against the other parent is detrimental to the best interests of a child.

We review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the court's factual findings. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) A court abuses its discretion in making a child custody order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child. (*Ibid*.) A court also abuses its discretion *if it applies improper criteria or makes incorrect legal assumptions*. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.)

Elenita contends that the trial court erred in failing to properly apply the presumption set forth in section 3044. In interpreting the meaning of a statute, courts give the words "their usual and ordinary meaning." (*Esberg v. Union Oil Co*. (2002) 28

---

pendente lite with the intent that it will be superseded by an award of custody after trial. Fam. Code, §§ 3022, 3040, 3060– 3062 . . . .' [Citation.]"].) Although the notice of appeal from the August 7, 2013 order indicates that the appeal from that order was taken from a "judgment after court trial," in fact, the August 7, 2013 order was *not* a judgment entered after a court trial, and Elenita has not explained how or why this order is independently appealable. (See Cal. Rules of Court, rule 8.204(a)(2) [an appellant's opening brief must "(A) State the nature of the action, the relief sought in the trial court, and the judgment or order appealed from; [¶] (B) State that the judgment appealed from is final, or explain why the order appealed from is appealable . . . "].)

Cal.4th 262, 268 (*Esberg*).) When the statutory language is clear and unambiguous, "we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.)

Section 3044, subdivision (a) provides:

> "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Section 3011. This presumption may only be rebutted by a preponderance of the evidence."

When considering whether the presumption provided in subdivision (a) of section 3044 has been rebutted, the trial court "shall" consider the following factors, as set forth in subdivision (b) of that provision:

> "(1) Whether the perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child. In determining the best interest of the child, the preference for frequent and continuing contact with both parents, as set forth in subdivision (b) of Section 3020, or with the noncustodial parent, as set forth in paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part.
>
> "(2) Whether the perpetrator has successfully completed a batterer's treatment program that meets the criteria outlined in subdivision (c) of Section 1203.097 of the Penal Code;
>
> "(3) Whether the perpetrator has successfully completed a program of alcohol or drug abuse counseling if the court determines that counseling is appropriate.

15

"(4) Whether the perpetrator has successfully completed a parenting class if the court determines the class to be appropriate.

"(5) Whether the perpetrator is on probation or parole, and whether he or she has complied with the terms and conditions of probation or parole.

"(6) Whether the perpetrator is restrained by a protective order or restraining order, and whether he or she has complied with its terms and conditions.

"(7) Whether the perpetrator of domestic violence has committed any further acts of domestic violence."

The clear terms of section 3044 require that a court apply a presumption that it is detrimental to the best interest of the child to award joint or sole physical or legal custody to a parent if the court has found that that parent has perpetrated any act of domestic violence against the other parent in the preceding five years. The presumption is rebuttable, but the court *must* apply the presumption in any situation in which a finding of domestic violence has been made. A court may not " 'call . . . into play' the presumption contained in section 3044 only when the court believes it is appropriate." (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1267.)

There is no indication in the record that the judges who made orders granting or affirming joint legal custody for Romer applied the mandatory presumption provided in Family Code section 3044. At the first restraining order hearing on May 15, 2013, Romer admitted that he had engaged in acts of domestic violence against Elenita, and the court impliedly found that Romer had committed acts of domestic violence, telling Elenita, "You clearly have a reason to request a permanent restraining order." Despite

16

this, Judge McAdam declined to issue the requested restraining order, explaining that a restraining order is not "a penalty" for prior bad acts, but instead, is intended to protect someone going forward. Judge McAdam apparently believed that Romer "[was] going to listen to what [the court has] to say," which suggests that the court believed that Romer would no longer engage in domestic violence directed toward Elenita. However, it is clear that the court found that Romer *had previously* engaged in domestic violence against Elenita.[6] A finding that one parent has committed an act of domestic violence against the other parent within the prior five years triggers the presumption mandated by section 3044.

Judge McAdam ultimately did not enter an order regarding custody after that hearing. Instead, Judge Longstreth addressed custody and visitation at a July 2013 hearing on Elenita's petition for dissolution and entered a temporary order with respect to those issues on August 7, 2013.[7] Rather than apply section 3044's presumption based on Judge McAdam's earlier finding of domestic violence, however, Judge Longstreth appeared to focus on the fact that Judge McAdam had not issued the restraining order that Elenita had requested at the May 15 hearing, stating: "That is kind of a strange order for

---

6      For example, the court told Elenita, "He's not going to hit you in the head to get your attention *anymore*" (italics added), demonstrating that the court found that Romer had, in fact, struck Elenita in the head in the past.

7      Notwithstanding the fact that the August 7, 2013 order is not separately appealable and that Elenita does not specifically seek reversal of that order, we discuss the merits of that order because the trial court incorporated the August 7, 2013 order into the final judgment, which is properly before us on appeal.

me to make [i.e., an order granting Elenita sole legal custody, as she was requesting] when the most current request for a restraining order was denied."

It appears that the court was under the misimpression that the presumption contained in section 3044 comes into play only upon the issuance of a restraining order. However, the presumption applies whenever there is a finding that one parent committed an act of domestic violence against another parent, a child, or a child's siblings within the past five years. (§ 3044, subd. (a) ["Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years . . . "].) Whether a restraining order is issued as a result of the domestic violence thus has no bearing on the applicability of the statutory presumption to the issue of custody.[8] Judge Longstreth should therefore have applied the presumption, given that

_____

[8] The Domestic Violence Protection Act (DVPA) authorizes the trial court to issue a restraining order "for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§§ 6300, 6220 [purpose of DVPA stated].) However, the fact that a trial court finds past abuse does not require that the court issue a restraining order; rather, a court may decline to issue a restraining order. Thus, the court will not necessarily issue a restraining order in every case in which there has been a finding of a past act of domestic violence.

It is possible that Judge Longstreth mistakenly believed that Judge McAdam's denial of Elenita's request for a permanent restraining order was based on a finding that no abuse had occurred, and was unaware that, in fact, the finding was based on Judge McAdam's belief that the parties' separation and/or the court's "talking to" directed at Romer would prevent Romer from engaging in further acts of domestic violence. In response to Elenita's attorney's statement that, "We didn't agree with the denial of the restraining order," Judge Longstreth said, "I understand that, and that's your right to

18

Judge McAdam had determined that Romer had in fact committed acts of domestic violence against Elenita. The failure to apply the section 3044 presumption in determining the issue of legal custody of the children was an abuse of the court's discretion.9

This error was compounded by Judge Groch's failure to reconsider the custody order after having found at the October 2013 hearing that Romer's past domestic violence and his more recent conduct warranted the issuance of a restraining order. Although the court clearly found that Romer's acts of domestic violence warranted the issuance of a restraining order, the court did not apply the section 3044 presumption in making the custody order, despite the fact that, as noted, the court was aware of section 3044's presumption against awarding joint custody to a perpetrator of domestic abuse.10 Instead

---

disagree with that, but I think that I need to go with what the findings were, not with what you wish they were."

9　The FCS report failed to acknowledge the presumption contained in section 3044. Despite noting that Romer had *admitted* to engaging in physically violent conduct against Elenita, the report recommended that the court order that the parties share joint legal custody, with no mention of the fact that the allegations of domestic violence and Romer's admissions regarding that violence might necessitate the application of section 3044's presumption. It is critical that the social workers who prepare the FCS reports be aware of the provisions of section 3044, and in particular, the mandatory presumption, and in making recommendations to the court, should, at a minimum, acknowledge that the court may be required to consider whether the presumption has been triggered in cases involving allegations of domestic violence.

10　Judge Groch's comments regarding the implication of the issuance of a restraining order appear to reflect a misunderstanding of the requirements of section 3044. We reiterate, the presumption of section 3044 is triggered *not* by the issuance of a restraining

19

of properly applying the presumption at that point in time, the court said, "If you currently have joint, legal custody—at this point, I'll leave that in place."  The court then indicated that Romer would have to comply with certain requirements in the future in order to "overcome [the] presumption of Family Code section 3044."

There is no reasonable basis for the trial court's failure to apply the section 3044 presumption at either of the two hearings at which the court addressed custody in this case.  The trial court thus abused its discretion in awarding Romer joint legal custody without applying the section 3044 presumption that it would be detrimental to the children's best interests to award joint legal custody.[11]  We therefore reverse the trial court's judgment to the extent that it orders that the parties share joint legal custody of the children, and remand for the trial court to reassess that custody order in light of the presumption set forth in section 3044, and to enter a new custody order after applying the presumption.

---

order, but rather, by a finding that a parent has engaged in an act of domestic violence against the other parent, the child, or the child's siblings.  If a domestic violence restraining order has been issued, then it is clear that there has been a finding of domestic violence sufficient to trigger the presumption of section 3044.  However, the failure to issue a domestic violence restraining does not necessarily mean that the court did not find that a party committed domestic violence sufficient to trigger the presumption as well, as this case demonstrates.

[11]    Because the trial court failed to apply the presumption, it follows that the court's award of joint legal custody could not have been based on Romer's having rebutted the presumption.

IV.

DISPOSITION

The appeal taken from the August 7, 2013 order is dismissed.

The portion of the judgment of dissolution in which the trial court awarded Romer joint legal custody of the children is reversed.  On remand, the trial court shall hold further proceedings consistent with this opinion, and shall determine the legal custody of the parties' children after applying the presumption set forth in section 3044. Specifically, the trial court may not award Romer joint legal custody unless Romer rebuts the presumption set forth in section 3044 that an award of joint legal custody is detrimental to the best interests of the children.  Elenita shall recover costs on appeal.

_____

AARON, J.

WE CONCUR:


_____

McCONNELL, P. J.


_____

O'ROURKE, J.

21