Filed 8/16/21  Marriage of Greene CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parents from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

|  |  |
|---|---|
| In re Marriage of MARTIN D. and HAMANI GREENE. | B304903 (Los Angeles County Super. Ct. No. 18STFL00554) |
| MARTIN D. GREENE,<br><br>Respondent,<br><br>v.<br><br>HAMANI GREENE,<br><br>Appellant. |  |

APPEAL from an order of the Superior Court of Los Angeles County, Joseph M. Lipner, Judge.  Affirmed.

Hamani Greene, in pro. per., for Appellant.

Latanya Sewell for Respondent.

———————————

Hamani Greene (Mother) appeals from a family court order denying her request for a move-away order to relocate to Chicago, Illinois with three-year-old Madison, the daughter of Mother and Martin Greene (Father).  On appeal, Mother contends the family court misstated and omitted material evidence in its statement of decision and erred in weighing the factors for assessing a move-away request set forth by the Supreme Court in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*).  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

A.    *The Dissolution and the Prior Custody Orders*
Mother and Father met in 2014 and married in September 2016.  Madison was born in October 2016.  Starting in November 2017 Mother worked remotely as a medical science liaison for a biotechnology company headquartered in Chicago, Illinois.  Mother has family in Chicago and lived there prior to her relationship with Father.  Father worked as a project manager for a construction company in downtown Los Angeles.  The family lived in an apartment in Encino, California.

On January 10, 2018 Father filed a request for a domestic violence restraining order against Mother, which was set for a hearing on April 4, 2018.  (*Greene v. Greene* (Super Ct. L.A. County, No. 18STRO00243).)  On January 16 Father filed a

_____

[1]    Our summary of the background facts is based on the undisputed facts set forth in the family court's January 22, 2020 statement of decision and the testimony and exhibits admitted at the evidentiary hearing on Mother's request for a move-away order.

2

petition for dissolution of marriage, and on February 16 he filed a request for order seeking custody orders. On March 16 Mother filed a request for order to move with Madison to Chicago.

On April 4, 2018, the date set for a hearing on Father's requests for a restraining order and custody orders, Mother and Father reached a stipulation in which they agreed to a custody arrangement premised on Madison remaining in Los Angeles. The stipulation provided Mother and Father would share legal custody over Madison, and Father would have physical custody on alternate weekends and Monday evenings to Tuesday evenings on the other weeks, with Mother having custody at all other times. Father took his request for custody orders off calendar and his request for a domestic violence restraining order off calendar with prejudice. The stipulation provided that "[n]either party shall move the child from the State of California without the other party's written consent or court order, which shall not be unreasonably withheld." The family court entered the stipulation as its order.

On June 7, 2018, Mother filed a second request for order to move with Madison to Chicago. The family court set an evidentiary hearing for October 3 and 4, 2018 and appointed a Family Court Services child custody evaluator to conduct a one-day parenting plan assessment. At the evidentiary hearing, child custody evaluator Dr. Adrienne Salick testified she interviewed each parent for an hour, as well as paternal grandfather Ronald Greene[2] and a nanny employed by Mother. Dr. Salick also observed each parent's interaction with Madison. Dr. Salick

---

[2]     To avoid confusion we refer to paternal grandfather by his first name.

testified Madison, then two years old, was very happy and had a strong positive connection to both parents. However, the parents' relationship with each other was strained, and they had significant difficulty communicating about Madison's care and the time-sharing arrangements. Father wanted equal time with Madison and felt Mother acted unilaterally; Mother felt Father, who had moved to Claremont to live with Ronald, worked long hours and was unavailable to spend time with Madison. Mother informed Dr. Salick she had better career advancement opportunities in Chicago and Madison would have better educational opportunities.

Dr. Salick recommended Mother be allowed to move to Chicago with Madison, with Madison spending up to five consecutive nights with Father every month, alternating between Los Angeles and Chicago, with additional visitation on holidays. Dr. Salick reported that "[Mother] assure[d] that she will co-parent and promote the relationship and keep [Father] informed."

On October 4, 2018, before the conclusion of the evidentiary hearing, Mother and Father reached a stipulation for custody and child support, as well as outstanding issues involving spousal support and property division. As part of the stipulation, Mother agreed she would remain in Los Angeles, and she and Father agreed to share joint legal custody of Madison, with Mother to retain primary physical custody and Father to have visitation every other weekend from Thursday evening through Monday evening, plus Thursday overnights during his off-weeks (an approximately 30% timeshare). Mother and Father agreed child exchanges would occur at a North Hollywood police station on a temporary basis, and the parents would attend eight joint

therapy sessions, for which Mother would pay any out-of-pocket costs remaining after submitting the bills to her insurance.

Mother confirmed on the record her agreement to the stipulation. Father's attorney agreed to prepare a judgment, and the family court set an OSC re: entry of judgment for January 31, 2019. Mother subsequently decided she did not want the stipulation to be entered as a judgment, causing Father to file a motion to enforce the stipulation and enter judgment. The court granted the motion and entered judgment effective August 27, 2019.

Just three months after entering into the stipulation, on December 20, 2018 Mother filed her third request for order to move to Chicago (the move-away RFO).[3] Father opposed the request.

B.    *Evidentiary Hearing*

The family court held an evidentiary hearing on the move-away RFO on four days between August 15 and October 18, 2019. Mother represented herself at the hearing. Mother, Father, and Ronald testified. The court admitted hundreds of pages of Mother's and Father's written communications through the Talking Parents messaging software sent from February 2018 through the time of the hearing. The court also admitted Father's work timesheets for the period from October 2018 to May 2019 (showing Father recorded an average of 9.3 hours of

---

[3]    Two weeks earlier the family court denied Mother's December 3, 2018 ex parte application to move to Chicago, finding no grounds for exigent relief under Family Code section 3064.

5

work per weekday during that period); sign-in sheets for Madison's preschool from November 2018 through February 2019 (showing Mother was the primary parent for dropoff and pickup); Dr. Salick's October 3, 2018 report and testimony; and photographs of Mother and Madison at preschool and family events.

### 1. *Father's testimony*

Father testified that in November 2017, Mother, upon learning of Father's infidelity, destroyed all of his clothing and other personal property and damaged his car. In December 2017 Father left the family home and moved to live with his father in Claremont. In January 2018 Mother showed up at Father's workplace with Madison in the car to confront him. Father started to enter a public stairwell, and Mother grabbed his bag, causing its contents to fall out. Father asked what she was doing, and she started yelling "don't hit me!" While this was happening, Madison was sitting alone in the car on a major street. When Father later returned to his car, he found his car had been keyed. Mother also called Father's work repeatedly, and Father's boss admonished him the disruptions were unacceptable. Father also testified that in the summer of 2018 Mother attempted to grope him, and she stole his wallet during a custodial exchange.

As to their shared custody of Madison, Father testified Mother unilaterally canceled his visits between five and 10 times in the past year. On the evening before the evidentiary hearing, when Father was scheduled to take Madison, Mother did not show up at the exchange location. Mother would often cancel exchanges because she claimed Madison was sick, but Mother

6

never provided a doctor's note, and she declined to give Madison to Father even when she acknowledged Madison was improving or only mildly sick. Father acknowledged Madison was often sick but attributed it to her beginning preschool. Mother also tried to dictate Father's makeup days, insisting he take those days when Mother had work commitments, and not when Father preferred to have additional time with Madison (for example, when he had visiting family).

Mother also tried to intrude into Father's parenting time with Madison. Mother told Father he had no right to make decisions concerning Madison's diet, and Mother would frequently call during Father's time and insist on speaking with Madison up to six or seven times in a 24-hour period. If Father failed to tell Mother who was caring for Madison while he was at work, Mother threatened to call the police. On one occasion, Mother rescinded permission she previously gave for Father to travel with Madison to Memphis to visit his family, stating the trip would cut into her custodial time. Father had to apply to the family court ex parte for permission to travel, which the court granted.

Mother threatened to move to Chicago with Madison numerous times, and Father believed she did this to extract custody concessions, noting that the move-away RFO followed Mother's repeated expression of her dissatisfaction with the custody terms of the stipulation. Despite Mother's representation to Dr. Salick that Mother had a support network and better career options in Chicago, Father believed Madison was not particularly bonded with any of her relatives in Chicago, and Mother's employment, where she planned to take Madison for daycare, was 50 miles from where Mother planned to live.

Father testified he worked 40 hours each week, from 8:00 a.m. to 5:00 p.m. Monday through Friday. Notwithstanding the time sheets showing he worked full days during his Fridays with Madison, he sometimes worked Fridays from home. Further, his job did not require travel, dinners, late nights, or surprise demands. Father admitted he never dropped off or picked up Madison from preschool, but the custody order stipulated that he and Mother would exchange Madison later in the afternoon in North Hollywood to allow Mother to spend more time with Madison after preschool. Father was available to pick up Madison after the end of his work day.

Father acknowledged he never participated in preschool programs and activities during weekdays, and he never observed Madison in preschool, but he met with Madison's teachers and attended weekend programs. Since the dissolution, Father had not attended Madison's regular medical or dental checkups, but this was because Mother scheduled the appointments at times convenient to her and only later provided him with notice. Father took Madison to the doctor's office when she was sick in his custody.

2. *Mother's testimony[4]*

Mother asserted she did not interfere with Father's parenting time. She denied she would withhold Madison from

---

[4] Mother's move-away RFO and supporting declaration, as well as Father's responsive declaration, are not included in the record on appeal. We assume Mother set forth facts supporting the move-away RFO in her declaration; however, Mother

Father if Madison simply had the "sniffles." Mother acknowledged that on one occasion when Madison was "severely ill" with a gastrointestinal illness in Mother's care, Mother kept Madison during Father's 24-hour custody time until all her symptoms were gone. Mother also admitted she refused to make an exchange in August 2018 because Ronald, with whom she recently had an altercation, was there to pick up Madison. Mother acknowledged Ronald typically made the afternoon exchanges while Father was at work and Mother's brother frequently made exchanges on her behalf.[5] Mother admitted, when shown some of her Talking Families messages to Father, that she had told Father with respect to childcare that she was going to do what best fit her budget and her and Madison's schedule, and it was "not about" Father. Mother also admitted telling Father he did not have a say in Madison's diet because Madison lived mostly with Mother, but Mother asserted she said this in the context of Madison's gastrointestinal issues.

Mother proposed in her move-away RFO that Father have only four weeks of visitation with Madison in Los Angeles each year to minimize the strain of air travel on Madison, but Father could visit Madison in Chicago at other times. Mother believed it

---

provided only limited testimony at the evidentiary hearing in response to questions from Father's attorney.

[5] Mother hired her brother as a full-time nanny after Madison's preschool term ended in June 2018. Mother did not need a full-time nanny while Madison was in pre-school; Mother used a nanny when she had to attend evening or dinner meetings.

was "equally important" Madison spend time with her relatives in Chicago as it was to spend time with Father. Mother acknowledged her existing house in Chicago was 50 miles from her job, but she asserted it was a temporary arrangement, and she planned to move closer to her job once she settled in. Asked by the family court what had changed between Mother's agreement to withdraw her previous move-away request in October 2018 and her filing of the December 2018 move-away RFO, Mother responded she erroneously believed she and Father could work out their issues, and her job responsibilities in Los Angeles changed to require more travel.

With respect to Father's allegations of domestic violence, Mother admitted she damaged some of Father's clothing, personal items, and car when she first learned of his marital infidelity. Mother also acknowledged she had previously testified inconsistently that Father's allegations she had damaged his clothing were false. Mother admitted visiting Father's workplace with Madison in January 2018, but she denied keying his car.

### 3. *Ronald's Testimony*

Ronald testified he often handled the exchanges and cared for Madison during Father's visitation while Father was at work. Father would normally arrive home around 6:30 p.m. and provided the majority of Madison's care. Ronald had a strong relationship with Mother, whom he thought of as a daughter, during the parents' marriage and for the first several months after their separation. However, as Mother had testified, in July 2018 Ronald and Mother got into an argument at a scheduled exchange outside of a restaurant over Mother's belief Ronald supported falsehoods in Father's custody declarations. When

10

Ronald began to carry Madison to his vehicle, Mother started to scream repeatedly, "Give me back my baby."  Mother then called the police on Ronald.

C.    *Statement of Decision*

On January 22, 2020 the family court issued a 24-page statement of decision and order denying the move-away RFO.[6] The court found Mother had perpetrated domestic violence against Father in November 2017 and January 2018 by shredding Father's clothing and damaging his car, but Father had not demonstrated Mother committed domestic violence by the alleged theft of Father's wallet in July 2018 or Mother's repeated calls and appearances at Father's workplace.[7]  The court found the presumption under Family Code section 3044, subdivision (a), against awarding sole or joint physical or legal

---

[6]    The family court issued a proposed statement of decision on December 23, 2019, and Mother, then represented by an attorney, filed detailed objections.  The family court made minor revisions to the proposed statement of decision but largely overruled Mother's objections.

[7]    Mother also alleged Father made statements that constituted acts of domestic violence towards her, including telling Mother she was responsible for his infidelity, commenting Madison did not have "nappy hair," and posting a clip of women fighting on his social media titled "Baby Mama v. Side Chick." The family court found that "while these statements may be unkind or tasteless[,] they do not constitute acts of domestic violence in the circumstances of this case."

11

custody to the perpetrator of domestic violence therefore applied,[8] but Mother rebutted the presumption under the factors set forth in section 3044, subdivision (b). Mother had a close bond with Madison, was a "caring and thoughtful mother," and had taken care of Madison for a substantial amount of time since November 2017. In addition, Father had given up his right to a restraining order by dismissing his request with prejudice, and Mother had not committed subsequent acts of domestic violence.[9]

The family court concluded Madison would suffer detriment if she moved to Chicago with Mother. The court found Father, as the noncustodial parent,[10] met his initial burden of proving

[8]     All further undesignated statutory references are to the Family Code. Family Code section 3044, subdivision (a), creates a rebuttable presumption that "an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . This presumption may only be rebutted by a preponderance of the evidence."

[9]     Mother contends the family court erred in making findings in the statement of decision that she committed acts of domestic violence in 2017 and 2018 because Father dismissed his domestic violence restraining order with prejudice as part of the first stipulation on custody and visitation. Because the family court found Mother successfully rebutted the custody presumption under section 3044, and its findings did not affect the court's decision in denying Mother's move-away RFO, we do not reach Mother's contention.

[10]     The family court held the parents' stipulated judgment on custody "seems to give [Mother] primary physical custody, with generous visitation time (approximately 30% ) to [Father]." (Citing *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 142

12

detriment to Madison, and "based on the testimony at the hearing and the parents' Talking Parents communications, . . . that there is a realistic possibility that [Father] will lose his connection with Madison if she relocates to Chicago." The court found Father credibly testified Mother sought to reduce his parenting time, canceled his visits, withheld Madison from visits when Madison was under the weather but not too sick, and asserted the right to make decisions about Madison's childrearing without Father.

As urged by both parents, the family court reviewed the entirety of the parents' Talking Parents communications. The court found there was a pattern of Mother limiting Father's visits, and it cited multiple examples, including: (1) In August 2018 Mother wrote to cancel an exchange a half hour before the scheduled time (when Father was already waiting at the exchange location) because Mother was "not feeling well"; (2) In April 2019 Mother wrote shortly before an exchange that she would not be able to bring Madison because of a "significant conflicts that will likely span beyond [Madison's] bedtime," ignoring Father's question whether Mother's brother could make the exchange and telling Father he could make up his time during Mother's upcoming "extensive work travel"; and (3) In May 2019 Mother declined to bring Madison to a scheduled exchange because Father had kept Madison longer on the

---

[parenting schedule of alternate weekends and Wednesday overnights did not constitute joint physical custody, but instead an arrangement where "one parent had, in substance, primary physical custody of the child and the other generous visitation rights"].)

previous exchange (at Mother's request), asserting, "I just picked her up yesterday and it does not make sense to drop her right back off."

Numerous communications showed Mother blaming Father for Madison being sick, including:  (1) In October 2018 Mother wrote "there is an obvious pattern of [Madison] returning home with a cold or virus of some sort"; (2) In November 2018 Mother wrote, "I do not think our current [a]rrangement is in her best interest. . . .  She has consistently been returned home with viral infections"; (3) In December 2019 Mother wrote, "Madison picked up a cold since being in your care" and "[t]he current arrangement is very disruptive and unstable.  It doesn't matter whether or not it's been agreed to";  and (4) In March 2019 Mother wrote, "As usual, Madison came back [from an overnight visit] with a cold and germs.  She was not this way when I delivered her to you."  Mother also unilaterally canceled Father's visitation due to Madison's health. In December 2018 Mother refused to bring Madison to an exchange for Father's overnight visit, asserting only a few hours beforehand that Madison had been sick with a fever.  Later that month, Mother wrote that Madison should remain with her during Father's time because Madison had "not resolved her infection" and needed to "be in one place until it is fully resolved."

The family court also identified several Talking Parents communications showing Mother believed she had the right to control Madison's care and consistently objected to Father's custody time with Madison.  For example, in July 2018 Mother objected to the way Madison's hair was being combed in Father's care.  Mother also wrote as to the custody arrangement, "I simply will not agree to more of a timeshare because that is too much

14

instability for Madison.  As it stands now, the eight nights is too much away from her home. . . ."  In January 2019 Mother wrote, "[Y]ou do not have a say on what her diet is if she mostly lives with me" and "[t]his arrangement is not working[.]  I said this to you before but you do not seem to care about what is best for our daughter."  In February 2019 Father complained to Mother that she had called him nine times in the prior 24 hours during his custody time, to which Mother responded, "I am never intrusive on your time.  I have explained to you that I think that it is [in] Madison's best interest to speak with or [F]acetime her primary caregiver at least once daily."

The July 2018 Talking Parents communications also corroborated Father's testimony that Mother withdrew her permission at the last minute for him to travel with Madison to see his family in Memphis, requiring him to seek ex parte relief.  Conversely, in January 2019 Mother informed Father she was taking Madison to Ohio for a funeral of a family member.  Father proposed he instead take care of Madison because of the cold weather forecast for Ohio, because Madison had been sick, and because Father had missed the previous weekend with Madison due to a swap requested by Mother.  Father also suggested he use the time to makeup for some of his prior canceled time, but Mother rejected the proposal and purchased plane tickets for her and Madison without continuing to discuss options with Father When Father expressed his displeasure with Mother's decision and asked her to "be sure to keep [Madison's] hands clean, head covered and coat zipped up please," Mother responded with over a page of angry responses in capital letters, criticizing Father's parenting of Madison and explaining Mother's decision.  As to Father's suggestion for Madison's care in the cold, Mother said,

15

"THANKS BUT I KNOW HOW TO TAKE CARE OF MADISON." Mother also refused to tell Father where she would be staying with Madison, stating "[d]ue to the nature of our relationship, quite frankly I don't feel comfortable with you knowing where I am staying."

The family court concluded from the Talking Parents communications that Mother did not appear to be acting maliciously toward Father, but her approach nonetheless sought to limit Father's time and assert control over the parenting of Madison. Mother generally did not address scheduling challenges by allotting more time to Father, except on occasions where she asked him on short notice to care for Madison during her own work emergencies. The court found Father's communications were "far from a model of cooperation and coparenting," but Father did not try to limit Mother's time or bond with Madison, and "nothing in [Father's] communications or the other evidence makes the Court believe that [Father] would interfere with or hinder [Mother's] relationship with Madison."

As additional evidence a move to Chicago would be deleterious to Madison's relationship with Father, the family court identified Mother's unnecessary altercation with Ronald at the exchange in July 2018 and subsequent hostilities, as well as Mother's proposal at the evidentiary hearing that Father only receive four 5-day visits with Madison in Los Angeles each year. The court found Dr. Salick's October 2018 recommendation after the one-day assessment that Mother be allowed to move away to be unpersuasive because "the [c]ourt has had the opportunity, in connection with [Mother's] subsequently filed move-away request, to spend more time with the parents and their evidence than the evaluator did. . . . The evidentiary hearing involved

significant information about events that transpired after the evaluation." For example, Dr. Salick reported Mother had assured her that after moving to Chicago, Mother would "co-parent and promote [Father's] relationship [with Madison] and keep Father informed," yet the court found Mother "was not able to co-parent to promote [Father's] relationship with Madison, even though both parents lived in the same city."

In addition, the court found Madison would be commuting 100 miles per day in Chicago, yet Mother had admonished Father on Talking Parents as to their current custody arrangement that "[t]here are a number of studies . . . which have supported that children should not be in a car seat for extended periods of time. . . . I hope that you would pay more attention to what this ridiculous [a]rrangement is doing to our daughter."

After finding Father met his initial burden of showing Madison would suffer detriment if she moved to Chicago, the family court considered the eight factors set forth in *La Musga* for evaluating a move-away request: "[1] the children's interest in stability and continuity in the custodial arrangement; [2] the distance of the move; [3] the age of the children; [4] the children's relationship with both parents; [5] the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; [6] the wishes of the children if they are mature enough for such an inquiry to be appropriate; [7] the reasons for the proposed move; and [8] the extent to which the parents currently are sharing custody." (*La Musga, supra*, 32 Cal.4th at pp. 1072, 1101.)

The family court found that Madison's interest in stability and continuity of custody (factor 1) favored the move, although

17

the court noted Father was "a loving and caring father" and the move would disrupt his care and emotional bond. The existing timeshare (factor 8) militated "somewhat" in favor of relocation with Mother, Madison's primary custodian. Madison's relationship with both parents (factor 4) and Madison's wishes (factor 6) were neutral because Madison was strongly bonded to both parents and too young to express a preference. Also neutral was Mother's rationale for the move (factor 7): on one hand, Mother presented evidence she had family in Chicago who could support Madison, but on the other, Mother failed to present any evidence other than her testimony that the Chicago position would provide more favorable work conditions, and Mother's pattern of serially filing and then withdrawing move-away requests "len[t] some credence" to Father's argument Mother was using her move-away threats as leverage in their custody negotiations.

The family court found the great distance of the move (factor 2) and Madison's age (then three years old) (factor 3) weighed against the move because Madison's nascent bond with Father would be damaged absent "continuing frequent custodial time with, and involvement by, her father." The court found significant the parents' relationship (factor 6), which "strongly advise[d] against moving to Chicago." Both parents were unable to communicate and cooperate effectively and to put Madison's interests first.[11] The court concluded, "The parties have not been

---

[11] The family court observed, "[s]o bad are the parents' communication with one another that they have even been unable to schedule co-parenting counseling sessions, which they agreed to as part of the stipulated judgment." Mother argued she

18

able to coordinate and cooperate in the same city, much less would they be able to do so across the country. . . . [I]f Madison moved to Chicago with [Mother] she would run the serious risk of losing a relationship with her father."

The family court provided a revised custody order that would take effect if Mother moved to Chicago. Under the order, Father would have primary physical custody of Madison. Father would bring Madison to Chicago to stay with Mother for one 5-night overnight visit for each of five months of the year and for two consecutive weeks in July, at Father's expense. Mother would be entitled to one 5-night overnight visit with Madison in Los Angeles during each of five other months, at Mother's expense, and an additional week alternating between Christmas and Thanksgiving.

Mother timely appealed. [12]

---

presented a list of counselors as provided under the judgment and it was an unexcused violation by Father not to accept one, but the court found in reviewing the Talking Parents communications and testimony that "the parties negotiated and discussed themselves in circles, resulting in a stalemate that left them exhausted and irate."

[12] Mother filed a motion for reconsideration of the tentative statement of decision, which the family court set for hearing after it issued the final statement of decision and order. The appellate record does not indicate the disposition of the motion, which we assume was denied or withdrawn. Mother does not on appeal challenge any ruling on her motion for reconsideration.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." (§ 7501, subd. (a).)  Accordingly, when a custodial parent proposes to relocate a child, "the noncustodial parent has the burden of showing that the planned move will cause detriment to the child in order for the court to reevaluate an existing custody order." (*LaMusga, supra*, 32 Cal.4th at p. 1096; accord, *In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 648-649 (*Winternitz*).)  "The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances.  We will generally leave it to the superior court to assess that impact in light of the other relevant factors in determining what is in the best interests of the child." (*LaMusga*, at p. 1097; accord, *Winternitz*, at p. 649.)

"If the noncustodial parent makes such an initial showing of detriment, the [family] court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the child[]." (*LaMusga, supra*, 32 Cal.4th at p. 1078; accord, *Winternitz, supra*, 235 Cal.App.4th at p. 650.)  "[T]his area of law is not amenable to inflexible rules." (*LaMusga,* at p. 1101.)  Rather, the family court must "exercise [its] discretion to fashion orders that best serve the interests of the children in the cases before [it]," applying the eight-factor test established by the *La Musga* court. (*Ibid*.; see *In re Marriage of C.T. & R.B.* (2019) 33 Cal.App.5th 87, 106 ["These factors are commonly referred to as the *LaMusga* factors.  We recognize that

20

this list of factors is not exhaustive.  [Citation.]  '[E]ach case must be evaluated on its own unique facts.'"].)

"We review orders granting or denying move-away requests for abuse of discretion."  (*Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, 1598-1599; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 ["The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test."]; *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497 ["We review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the court's factual findings."].)  "Generally, a trial court abuses its discretion if there is no reasonable basis on which the court could conclude its decision advanced the best interests of the child."  (*Jacob A.*, at p. 1599.)  A court also abuses its discretion "'by applying improper criteria or by making incorrect legal assumptions.'"  (*In re Marriage of C.T. & R.B., supra*, 33 Cal.App.5th at p. 97; accord, *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 901.)  Ultimately, "[t]he test is not whether [the reviewing court] would have made the same order or whether the trial court could have reasonably made some other order, but 'whether the trial court could reasonably have concluded that the order in question advanced the "best interest" of the child.'"  (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595; accord, *Burgess*, at p. 32 ["The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child."].)

B.      *The Family Court Did Not Abuse Its Discretion in Finding a Move to Chicago Was Not in Madison's Best Interest*

In denying the move-away RFO, the family court considered all of the *LaMusga* factors and concluded based on Madison's young age, the great distance of the move, and Mother's and Father's inability to communicate and coparent effectively that "if Madison moved to Chicago with [Mother] she would run the serious risk of losing a relationship with her father." The court did not abuse its discretion.

Substantial evidence supported the family court's factual findings that Mother consistently sought to reduce Father's parenting time and asserted the unilateral right to make decisions about Madison's rearing. The court found Father "credibly testified" on these topics, and it cited numerous Talking Parents communications where Mother canceled a scheduled exchange with Father because Mother was not feeling well or had a work conflict, or Mother decided not to drop Madison off after only a short stay with Mother. As the family court found, Mother did not appear to be acting maliciously to Father, but Mother reflexively addressed the challenges inherent in sharing custody by limiting Father's time and prioritizing her own schedule, rather than allotting more time to Father or accommodating his requests, as exemplified by Mother's insistence on taking Madison with her to Ohio in January for a funeral but refusal to let Father take Madison to Memphis to see his family. By contrast, although Father's communications were also "far from a model of cooperation and coparenting," Father did "not try to limit [Mother's] time or bond with Madison."

The family court also cited numerous instances where Mother tried to control how Father parented Madison, blaming

Father repeatedly for Madison's minor ailments, objecting to the way Madison's hair was combed, telling Father he did "not have a say on what her diet is if she mostly lives with me," calling repeatedly during Father's visits, and continually asserting that the custody arrangement was not working and Madison should not have to travel so much. As discussed, based on these findings and others set forth in the statement of decision, the family court concluded that insofar as "the parties have not been able to coordinate and cooperate in the same city, much less would they be able to do so across the country."

The family court properly considered all the *LaMusga* factors, and it was within the court's broad discretion to attach paramount importance to the parents' relationship (factor 5), which in combination with the distance of the move and Madison's age (factors 2 and 3), resulted in a "serious risk of [Madison] losing a relationship with her father," considerations sufficient to overcome both Mother's presumptive right to relocate and the *La Musga* factors that supported a move, including the existing custody arrangement and Mother's greater timeshare (factors 1 and 8). (*LaMusga, supra*, 32 Cal.4th at p. 1093 ["The weight to be accorded to such factors must be left to the court's sound discretion."].)

The facts of this case mirror those in *LaMusga*. There, the mother with primary physical custody sought an order to move to Cleveland, Ohio with the parents' two young children. (*LaMusga, supra*, 32 Cal.4th at p. 1079.) A court custody evaluator testified the mother was struggling with supporting frequent contact between the children and their father, did not support additional time with father even though he lived only five miles away, and consistently limited father's custody time.

(*Id*. at p. 1080.)  The evaluator expressed a concern "'about [the mother's] willingness to follow through on regular and consistent visitation if she is half a country away'" and opined "'the children have not reached an age where they can maintain this attachment [to the father] if they are away from him over long distance and time.'"  (*Ibid*.)  The family court denied mother's move-away request, placing "'primary importance' on the effect the proposed move would have on the relationship between the children and their father, finding the proposed move would be "'extremely detrimental' to the children's welfare."  (*Id*. at p. 1093.)  Although the Court of Appeal concluded the family court abused its discretion in placing undue emphasis on the detriment to the children's relationship with the father, the Supreme Court reversed the Court of Appeal's decision, holding the family court "reasonably concluded . . . [t]he parents' history of animosity and the mother's consistent attempts to limit contact between the children and their father indicated that the proposed move would be detrimental to the children" because it was "unlikely that she would facilitate the difficult task of maintaining the father's long-distance relationship with the boys."  (*Id*. at p. 1095; accord, *Winternitz, supra*, 235 Cal.App.4th at p. 655 ["[T]he family court's emphasis on the respective attitude of each parent regarding visitation with the other parent does not demonstrate an abuse of discretion" where sufficient evidence supported findings that "the relationship between [f]ather and [son] 'would certainly run a high risk of being greatly diminished if the request to move to Chico [were] granted[.]'"].)

On appeal, Mother asserts the family court made three errors.  First, she contends the court erred in weighing the distance of the move against the move-away, arguing this factor

should have been neutral.  Mother does not challenge the family court's finding that it would be logistically difficult for Madison to maintain a relationship with Father if she moved to Chicago. Instead, Mother argues "[i]n the reverse however, the [c]ourt did not consider the logistics difficult for Mother in the event that Mother would move without the parties' daughter."  Mother's argument misapprehends the family court's task in deciding a move-away request.  Section 7501, subdivision (a), provides that the custodial parent has the right to change the residence of the child, "subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child."

Here, the family court reasonably found that moving Madison thousands of miles from her present home would harm Madison's welfare.  Contrary to Mother's argument, the court's contingent custody order that reassigned primary physical custody to Father if Mother elected to move does not show the court erred in its consideration of this factor because the court had no power to stop Mother from moving.  (See *In re Marriage of Paillier* (2006) 144 Cal.App.4th 461, 464 ["If the court rules in favor of Dad, Mom then must decide whether she still wants to move, given that moving will mean losing custody.  Of course, a third option would be to enjoin Mom from moving.  However, it has been held that this would violate Mom's federal constitutional right to travel."].)  It is precisely because a two-thousand-mile move would be highly detrimental to Madison's bond with whichever parent becomes distant from Madison that this factor militates against allowing Madison to move.[13]

---

[13]  Even if we were to consider the harm to Mother if she decides to move to Chicago without Madison in weighing the

25

Second, Mother argues in a similar vein that the family court erred in weighing Madison's young age against the move-away. Again, Mother does not dispute the court's finding that because Madison was only three years old, "[s]he has not had the time to establish a lasting bond with both parents that would survive a move, absent continuing frequent custodial time with, and involvement by, her father." Mother instead argues that because Madison's relationship with both parents would be harmed by a move that separated her from one of her parents, the age factor should be neutral. But the undisputed finding that a move would be particularly harmful to Madison on account of her age—in contrast to an older child who would have had an opportunity to develop stronger parental bonds and maintain a long distance relationship—militates against the family court granting the move-away RFO.

Third, Mother contends the statement of decision misstated the record and omitted important facts regarding the parents' coparenting and Mother's efforts to restrict Father's visitation. Mother's opening brief includes dozens of excerpts of the record that she contends call into doubt the family court's findings that Mother sought to limit Father's custodial time, blamed Father for

distance factor, there are grounds to conclude that the factor still militates against the move-away. The family court found Father "generally approves requests by [Mother] to travel without fuss or drama" and it was less likely Father would interfere with Mother's relationship with Madison than the converse. The family court also provided in the contingent custody order for "significant periods of time that Madison will be with [Mother] in both Chicago and Los Angeles so that the emotional bonds and significant periods of care will continue."

Madison's illnesses, and did not promote Madison's relationship with Father.  For example, Mother identifies Talking Parents communications in which Father acquiesced to Mother's requests to reschedule his visitation, either by confirming he would not be at the exchange location or agreeing to take a makeup day with Madison.  Mother points to Father's admission that Madison was often sick and instances where Father was equally patronizing to her.  For example, when Mother wrote, "Madison vomited again today.  What did she eat while with you on yesterday?," Father responded, "She has never vomited while in my care.  You may have some contaminated food at the house.  Pay attention to what you are feeding her and see if some of the same foods are close to the time of vomiting."  Mother also identifies evidence she believes shows her efforts to support Madison's relationship with Father, including comprehensive evidence that Mother sent Father photographs and projects from Madison's preschool and activities and invited Father to Madison's medical and dental appointments and social functions.  Yet, Mother argues, Father never attended these events and never visited Madison in preschool.  Mother also identifies what she considers to be impeachment evidence, for example identifying an email where she told Father, "I would like to get your thoughts on both the Discovery School as well as Early Discoveries in Chicago" to contradict Father's testimony that he had "no input" in the selection of Madison's daycare.

As discussed, we apply a substantial evidence standard to the court's factual findings.  (*In re Marriage of Fajota, supra*, 230 Cal.App.4th at p. 1497.)  "'On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable

27

inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence. [Citation.]' [Citation.] 'We do not reweigh the evidence or reconsider credibility determinations.'" (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34; *In re Marriage of Jones* (1990) 222 Cal.App.3d 505, 515 ["The task of the appellate court is limited to searching the record for any substantial evidence which will support the judgment."].) The family court found Father's testimony credible and marshaled detailed evidence in the Talking Parents communications to substantiate its findings. Many of the purported misstatements and omissions raised by Mother were explored at the trial and do not contradict the evidence supporting the court's order, and it was the proper role of the family court to weigh the evidence and evaluate the credibility of the witnesses.

## DISPOSITION

The family court's January 22, 2020 order denying the move-away RFO is affirmed. Father is to recover his costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.          IBARRA, J.*

---

\* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.